## STATE OF CONNECTICUT *v.* RAYMOND HARDY
### (SC 17324)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued November 28, 2005—officially released May 9, 2006

*Deborah G. Stevenson,* special public defender, for the appellant (defendant).

*Marjorie Allen Dauster,* senior assistant state's attorney, with whom, on the brief, were *David I. Cohen,* state's attorney, and *Michael DeJoseph,* deputy assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Raymond Hardy, was convicted of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2)[1] after a trial to the court. The Appellate Court affirmed the judgment of conviction in part and reversed it in part. *State* v. *Hardy,* 85 Conn. App. 708, 719, 858 A.2d 845 (2004).We granted the defendant's petition for certification to appeal from the judgment of the Appellate Court as to the following issue: "Does a 'deadly weapon' as defined in General Statutes § 53a-3 (6)[2] require that a shot be discharged by gunpowder?"[3] *State* v. *Hardy,* 272 Conn. 906, 863

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[2] General Statutes § 53a-3 (6) provides in relevant part: " 'Deadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. . . ."

[3] We granted certification to appeal from the Appellate Court limited to the following two issues: "1. Does a 'firearm' as defined in General Statutes § 53a-3 (19) require that a shot be discharged by gunpowder?

"2. Does a 'deadly weapon' as defined in General Statutes § 53a-3 (6) require that a shot be discharged by gunpowder?" State v. Hardy, 272 Conn. 906, 863 A.2d 699 (2004). Upon motion of the state for reconsideration of the order granting certification as to the first question, we subsequently ordered that the petition for certification be limited to the second issue.

A.2d 699 (2004). We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts and procedural history. "On December 9, 2000, the victim, an employee of Norwalk Taxi, was dispatched to 12 North Taylor Avenue in Norwalk. Upon arrival, Leland Brown approached the victim's taxicab from the front of the vehicle and got in through the back door on the driver's side. The victim turned his head to ask Brown where he wanted to go and Brown put the barrel portion of a gun to the victim's neck. Brown demanded that the victim give him all of his money and, in response, the victim gave him more than $800 in cash. Brown then exited the taxicab, and the victim informed his dispatcher of the incident. The dispatcher notified the police and, shortly thereafter, the police arrived at the scene of the robbery. The victim told the police that the robber was an African-American male who wore dark jeans, a jacket patterned in camouflage or animal print and a wool hat. The victim also told the police that one of the bills stolen had an order for Chinese food written on it in brown marker.

"After Brown exited the taxicab, he and the defendant, who waited nearby, ran back to the defendant's apartment at 16 Ferris Avenue. While running, the men were spotted by Tirso Gomez, a United States Postal Service employee who was working in the area. A short time later, Gomez was questioned by the police. Gomez informed the police that he saw the defendant and another man running toward the defendant's apartment from the direction of the robbery, which was approximately one-half block away. Gomez was familiar with the defendant, provided the police the defendant's name and address, and told them that the defendant was wearing a yellow jacket or sweater and that one of the men was wearing a cap.

"Acting on that information, the police surrounded 16 Ferris Avenue and began calling the telephone in the defendant's apartment. Eventually, Brown exited the building, wearing a camouflage jacket and a hat, and was arrested and taken into custody. The police searched Brown and found $339 on his person, including a bill that 'had some kind of writing on it.' Outside the defendant's apartment, the victim identified Brown as the man who robbed him earlier that day.

"Eventually, the police forcibly entered the defendant's apartment. Once inside, the police found a silver Crosman air pistol hidden in a clothes hamper between the defendant's bedroom and his mother's bedroom, an information manual for the air pistol, and the defendant, wearing a yellow and gray sweater, hiding underneath his couch. The defendant was arrested and, after he was in custody, told the police that the rest of the money taken during the robbery was hidden in his videocassette recorder. The police returned to the defendant's apartment and recovered an additional $555 from inside the videocassette recorder in his bedroom.

"The defendant was tried under the accessory theory of liability and was convicted of robbery in the first degree in violation of § 53a-134 (a) (2) and criminal use of a firearm or electronic defense weapon in violation of [General Statutes] § 53a-216. The court sentenced the defendant to twenty years incarceration, suspended after ten years, on the robbery conviction, five years incarceration to run concurrent to his twenty year sentence on his conviction of criminal use of a firearm or electronic defense weapon, and five years probation." *State* v. *Hardy,* supra, 85 Conn. App. 710–12.

The following additional facts and procedural history are relevant to our resolution of the certified issue. Evidence presented at trial established that the air pistol found in the defendant's apartment used carbon dioxide

cylinders as a propellant and was designed to shoot .177 caliber pellets. Although the pistol was unloaded when it was found, it was tested by a police detective and was operational. The state also submitted as a full exhibit the pistol's operating manual, which stated that the pistol was "NOT A TOY. . . . MISUSE OR CARE-LESS USE MAY CAUSE SERIOUS INJURY OR DEATH. MAY BE DANGEROUS UP TO 400 YARDS . . . ."[4] The state argued to the court that, as a matter of common sense, the gun, particularly when used at close range, could be a deadly weapon and could cause serious physical injury. The defendant argued that the pellet pistol did not use gunpowder and could not cause death or serious physical injury and, therefore, did not fit within the statutory definition of a deadly weapon.

The Appellate Court, sua sponte, reversed the defendant's conviction of criminal use of a firearm and directed the trial court to vacate that conviction and to resentence the defendant accordingly. *State* v. *Hardy*, supra, 85 Conn. App. 719.[5] The court affirmed the judgment in all other respects.

[4] The operating manual describes the gun itself as a "pellet pistol," "air-gun," or "air pistol." It specifies that the gun has an "8 Shot Revolver" mechanism that shoots .177 caliber "Lead Airgun Pellet" ammunition. The gun is designed to shoot its ammunition at a muzzle velocity of at least 430 feet per second.

[5] The Appellate Court noted that General Statutes § 53a-216 (a) provides: "A person is guilty of criminal use of a firearm or electronic defense weapon when he commits any class A, B or C or unclassified felony as defined in section 53a-25 and in the commission of such felony he uses or threatens the use of a pistol, revolver, machine gun, shotgun, rifle or other firearm or electronic defense weapon. No person shall be convicted of criminal use of a firearm or electronic defense weapon and the underlying felony upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information." (Emphasis in original; internal quotation marks omitted.) State v. Hardy, supra, 85 Conn. App. 713. The court reasoned that, "[t]he defendant in this case was convicted of criminal use of a firearm and the underlying felony of robbery in the first degree. It was improper for the court to have convicted the defendant of both crimes charged in light of the statutory prohibition against such a double conviction." Id.

On appeal to this court, the defendant challenges his conviction under § 53a-134 (a) (2) of robbery in the first degree, which required proof that he was armed with a deadly weapon, on the ground that the air gun used by the defendant was not a deadly weapon. He argues that deadly weapons that discharge shots, as defined in § 53a-3 (6), are necessarily firearms, which discharge shots by gunpowder, and, therefore, the Appellate Court improperly concluded that the air pistol, which does not use gunpowder, was a deadly weapon. See id., 718. In response, the state claims: (1) the Appellate Court properly concluded that the air pistol was a weapon from which a shot may be discharged within the meaning of § 53a-3 (6); and (2) in the alternative, even if we find that the trial court improperly concluded that deadly weapons must discharge shots by use of gunpowder, the state presented sufficient evidence for the trial court to find the defendant guilty of the lesser included offense of robbery in the third degree under General Statutes § 53a-136. We agree with the state's first claim, and thus need not reach its second.

Whether § 53a-3 (6) requires that the shot be discharged by gunpowder is a question of statutory interpretation. "Statutory construction is a question of law and therefore our review is plenary." (Internal quotation marks omitted.) *State* v. *Ramos*, 271 Conn. 785, 791, 860 A.2d 249 (2004).

"The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z. "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of

the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." General Statutes § 1-1 (a).

With these principles in mind, we begin by examining the language of § 53a-3 (6). Section 53a-3 (6) defines a " '[d]eadly weapon' " in relevant part as "any weapon, whether loaded or unloaded, from which a shot may be discharged . . . . The definition of 'deadly weapon' in this subdivision shall be deemed not to apply to section 29-38 or 53-206 . . . ." Thus, the legislature has defined deadly weapon to mean any *weapon* from which a *shot* may be *discharged*. The defendant does not claim that the air gun was not a weapon or that it did not fire shots. Instead, he claims that the "discharge" of the weapon, as used in § 53a-3 (6), must take place through the use of gunpowder. We disagree.

First, the plain language of § 53a-3 (6) does not require that the shot be discharged by gunpowder. Rather, the statute refers to *"any* weapon, whether loaded or unloaded . . . from which a shot may be discharged . . . ." (Emphasis added.) Had the legislature intended to include in its definition only those weapons that discharged by use of gunpowder, it could have done so expressly through the language of the statute. See *State* v. *Payne*, 240 Conn. 766, 776, 695 A.2d 525 (1997).

Second, although this court previously has not considered the question before us, the Appellate Court has considered it indirectly and has suggested that an air pistol is a deadly weapon. In *State* v. *Osman*, 21 Conn. App. 299, 300–301, 305, 573 A.2d 743 (1990), rev'd on other grounds, 218 Conn. 432, 589 A.2d 1227 (1991), the defendant was charged with robbery in the first degree involving the use of a dangerous instrument under

§ 53a-134 (a) (3)[6] after he allegedly robbed a convenience store and allegedly threatened to shoot a store clerk with an unloaded .177 Crosman air pistol. The Appellate Court, in determining whether the unloaded air pistol could be considered a dangerous instrument as defined by § 53a-3 (7),[7] discussed the distinction between deadly weapons and dangerous instruments. The court noted that "[o]ur modern penal code preserves, to a great extent, the distinction between those weapons that are deadly per se and those that are not. . . . The term deadly weapon is confined to those items *designed for violence.*" (Emphasis added.) Id., 306; see also Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-3 (West 2001), comments, p. 239 ("'[d]eadly weapon' is confined to those items designed for violence").[8] The court con-

---

[6] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[7] General Statutes § 53a-3 (7) defines " '[d]angerous instrument' " in relevant part as: "[A]ny instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ."

[8] "While the commission comment hardly has the force of enacted law, it, nevertheless, may furnish guidance." Valeriano v. Bronson, 209 Conn. 75, 94, 546 A.2d 1380 (1988).

Justice Borden states in his concurring opinion that he believes that we place too much emphasis on this portion of the commentary to the Penal Code. He believes that there is no need for the trial court to conduct a case-by-case inquiry into whether a particular item is " 'designed for violence' " because the legislature merely intended for that phrase to describe, not to limit, the term "deadly weapon." In other words, Justice Borden believes that all weapons from which a shot may be discharged are " 'designed for violence,' " provided, "[o]f course, [that] the gun must be a true gun, not a toy; and what is discharged must be a 'shot,' not, say, a paintball."

We do not believe that our interpretation differs significantly from Justice Borden's. We hold only that, if there is some question, as there was in the present case, as to whether the item that the defendant is charged with using was a weapon or, instead, was a toy or some other relatively harmless instrument capable of discharging a shot, that question must be answered by determining whether the item was designed for violence and capable of

cluded that, because the defendant allegedly threatened to shoot, but did not threaten to bludgeon the clerk with the unloaded pistol, the pistol was not a dangerous instrument under the circumstances in which it was alleged to have been used. *State* v. *Osman*, supra, 307. In dictum, however, the court noted that the state could have charged the defendant under § 53a-134 (a) (2) because the pellet pistol was a deadly weapon, i.e., a weapon designed for violence.[9] Id., 307 n.3.

Many other courts that have confronted the question directly also have concluded that an air or pellet gun is both designed for violence and capable of causing death or serious bodily injury. In *McCaskill* v. *State*, 648 So. 2d 1175, 1178 (Ala. Crim. App. 1994), the Court of Criminal Appeals of Alabama concluded that a BB gun could constitute a deadly weapon where the term was defined as "[a] firearm or anything manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury, and such term includes, but is not limited to, a pistol, rifle or shotgun; or any billy, black-jack, bludgeon or metal knuckles." Id. Likewise, in *State* v. *Cordova*, 198 Ariz. 242, 243, 8 P.3d 1156 (1999), the Arizona Court of Appeals concluded that a pellet gun was a deadly weapon for purposes of an aggravated assault conviction when " 'deadly weapon' " was defined as " 'anything designed for lethal use,' including a 'firearm.' [Ariz. Rev. Stat.] § 13-105 (13) [2001]."

inflicting serious bodily injury or death. To the extent that Justice Borden believes that the answer to that question always will be self-evident, we disagree.

[9] The court stated that "[t]he defendant in the present case could have been charged with first degree robbery under either General Statutes § 53a-134 (a) (2) or § 53a-134 (a) (4). The pellet pistol used in the robbery is a weapon designed for violence. The weapon fits the definition of the term 'deadly weapon' at § 53a-3 (6). This term appears in § 53a-134 (a) (2). The weapon also fits the definition of 'firearm' in § 53a-3 (19). This term appears in § 53a-134 (a) (4)." State v. Osman, supra, 21 Conn. App. 307 n.3.

In *People* v. *Lochtefeld*, 77 Cal. App. 4th 533, 535, 540, 91 Cal. Rptr. 2d 778 (2000), the California Court of Appeals held that a pellet gun is not a firearm because it does not use an explosive to project a bullet. The court concluded, however, that because the pellet pistol was "a gun . . . capable of inflicting great bodily injury"; id., 541; it was a deadly weapon within the meaning of a provision of the Penal Code prohibiting the use of a "deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer . . . ." (Internal quotation marks omitted.) Id., 535. The court noted that a deadly weapon is statutorily defined as "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." (Internal quotation marks omitted.) Id., 538–39. A criminalist, who had examined and test fired the defendant's gun, testified that it was capable of firing projectiles at speeds of over 380 feet per second, faster than the speed necessary to penetrate human skin, muscles, and eyeballs. Id., 536–37. The court concluded that "the determinative question is not the distinction between 'firearms' and 'pellet guns,' but between those guns capable of inflicting great bodily injury, and those that are not." Id., 540.

Likewise, in *Merriweather* v. *State*, 778 N.E.2d 449, 453, 458 (Ind. App. 2002), the Indiana Court of Appeals concluded that two BB guns[10] that the defendant's accomplices had used to threaten victims during the robbery of a restaurant were deadly weapons. The legislature had defined "deadly weapon . . . as a loaded or unloaded firearm . . . or other material that in the

---

[10] Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) defines a BB in relevant part as "a shot pellet 0.175 inch in diameter for use in an air gun." The Crosman pellet gun in question is designed to shoot pellets of roughly equivalent size, 0.177 inch in diameter.

manner it is used, or could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury. . . .

"Thus, based on the statute, there are two categories of deadly weapons: (1) firearms; and (2) weapons capable of causing serious bodily injury. . . . The question of whether a weapon is a deadly weapon is determined from a description of the weapon, the manner of its use, and the circumstances of the case. . . . The fact finder may look to whether the weapon had the actual ability to inflict serious injury under the fact situation and whether the defendant had the apparent ability to injure the victim seriously through use of the object during the crime." (Citations omitted; internal quotation marks omitted.) Id., 457. Testimony at trial had established that the BB guns could "propel a projectile up to [200] feet per second" and that "a projectile traveling [200] to [250] feet per second can pierce human skin and enter the body." Id., 458. The court determined that "[t]his evidence shows that the BB guns were actually able to inflict serious bodily injury." Id. On the basis of this finding, the court concluded that a BB gun is a deadly weapon. Id., 458–59.

In *Campbell* v. *State*, 577 S.W.2d 493, 495 (Tex. Crim. App. 1979), a defendant accused of aggravated robbery argued that the .22 caliber air pistol with which he threatened the victim was not a deadly weapon, which was defined as " 'a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or . . . anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.' " Id., quoting Tex. Penal Code Ann. § 1.07 (a) (11) (Vernon 1974), now codified at Tex. Penal Code Ann. § 1.07 (a) (17) (Vernon 2003). The court concluded that the pistol was a deadly weapon because it had been used to threaten the complainant and "was capable of inflicting death

or serious bodily injury and was designed for that purpose." *Campbell* v. *State,* supra, 496; see also *Mitchell* v. *State,* 698 So. 2d 555, 560 (Fla. App. 1997) (jury reasonably could find that BB gun was deadly weapon, defined as " 'any instrument that, when used in the ordinary manner contemplated by its design and construction, will or is likely to cause death or great bodily harm,' " or dangerous weapon, defined as " 'milder' then 'deadly weapon,' but 'otherwise of the same meaning,' " when defendant implied that weapon was loaded and operable and when likelihood of injury analyzed from perspective of victim).

In comparison, in *State* v. *Coauette,* 601 N.W.2d 443, 445, 447–48 (Minn. App. 1999), the Minnesota Court of Appeals held, inter alia, that a " '68 caliber pump-action [carbon dioxide] powered' " paintball gun was neither a firearm under a drive-by shooting statute nor a dangerous weapon under the assault statute.[11] The court first noted that, in *State* v. *Seifert,* 256 N.W.2d 87, 88 (Minn. 1977), the Minnesota Supreme Court had held that a carbon dioxide BB pistol qualified as a firearm because the term should be "defined broadly to include guns using newer types of projectile propellants and should not be restricted in meaning to guns using gunpowder." (Internal quotation marks omitted.) *State* v. *Coauette,* supra, 446. In *Coauette,* the court considered "not just . . . the propellant . . . but also . . . the purpose of the projectile the gun is designed to discharge." Id. "In

---

[11] Minnesota does not define deadly weapon by statute. It defines dangerous weapon, however, as "any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm . . . or other device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm, or any fire that is used to produce death or great bodily harm. . . ." Minn. Stat. Ann. § 609.02 (6) (West 2003).

Thus, items that are dangerous weapons under Minnesota law would be deadly weapons under the laws of many other states. *Coauette* is instructive in the present case because it supports the conclusion that a weapon that is not discharged by gunpowder is capable of causing death or serious bodily injury.

contrast to *Seifert . . .* in which the air guns were designed to shoot BB pellets that would pierce and harm the objects struck—whether bird, rodent, or human . . . the [paintball] gun here was designed for use in a game and . . . its projectiles are liquid-paint capsules designed to burst on impact, rather than to pierce. . . . [A] paintball has nothing like the destructive capacity of a bullet or BB." Id., 446–47. The court thus reasoned that a paintball gun also was not a dangerous weapon, which was defined as "any device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." (Internal quotation marks omitted.) Id., 447. The court concluded that paintballs are "intended and designed to break on contact and simply . . . splash a dose of nontoxic liquid paint" and are not " 'calculated or likely to produce death or great bodily harm.' " Id. In reaching its conclusion that BB guns are firearms and dangerous weapons, but that paintball guns are not, the court in *Coauette* considered the intent of the legislature to include only those weapons that are *designed* to cause severe injury or death. Id., 446–47.

With these authorities in mind, we conclude that the legislature did not intend to restrict the definition of deadly weapon in § 53a-3 (6) to weapons that discharge ammunition by the use of gunpowder. We recognize that the persuasive value of these cases is limited by differences between our statute and the statutes of other states. Specifically, we recognize that § 53a-3 (6) does not expressly define deadly weapons as instruments that are *designed* or *intended* to cause death or serious bodily injury, as the statutes in many other states do. See, e.g., *McCaskill* v. *State,* supra, 648 So. 2d 1178; *People* v. *Lochtefeld,* supra, 77 Cal. App. 4th 538; *Merriweather* v. *State,* supra, 778 N.E.2d 457. As the Appellate Court recognized in *State* v. *Osman,* supra, 21 Conn. App. 306, however, § 53a-3 (6) was intended to encompass "items *designed for violence."* (Emphasis

added.) See also Commission to Revise the Criminal Statutes, Penal Code Comments, supra, § 53a-3. Moreover, all of the items listed in the statute are capable of causing death or serious bodily injury. We therefore conclude that, if a weapon from which a shot may be discharged is designed for violence[12] and is capable of

[12] We recognize that not all items capable of discharging a shot are weapons or designed for violence. Cf. *State* v. *Coauette,* supra, 601 N.W.2d 443 (paintball gun is not dangerous weapon). We further recognize that many guns that are capable of causing death or serious bodily injury were not designed for violence against persons. Nevertheless, such guns are designed for violence in the sense that they are intended to cause damage or injury to their intended target.

In her dissent, Justice Katz agrees that a fact finder reasonably could conclude that the air pistol at issue in the present case was capable of causing serious injury or death to a person. She believes, however, that the legislature intended that the weapon must have been designed for the type of violence that could kill or seriously injure humans and that the trial court reasonably could not have concluded that the gun was designed for that purpose. We see no evidence, however, that the legislature intended to exclude from the definition of "deadly weapon" weapons that are capable of killing or seriously injuring a human but are designed only to penetrate targets or kill small animals. Rather, common sense leads to the conclusion that if a "weapon . . . from which a shot may be discharged"; see General Statutes § 53a-3 (6); is capable of killing a human, the legislature intended to penalize the use of that weapon during the commission of a crime. Moreover, we have difficulty understanding how a weapon could be simultaneously (1) designed for violence and capable of killing or seriously injuring a human and (2) not designed for the type of violence that could kill or seriously injure a human.

To the extent that Justice Katz suggests the addition of yet another requirement to the statutory definition, namely, that a gun is a deadly weapon only if it was designed to inflict the type of violence that could kill or seriously injure a person when it was used as it was intended to be used, we also disagree. The fact that a pellet gun was intended to be used to penetrate a target at a range of 100 feet and cannot kill or injure a human unless aimed at a vulnerable part of the body at close range does not meaningfully distinguish it from a gun that was intended to be used to penetrate a target at a range of 1000 feet and can kill a human at a range of up to 100 feet. It would have been small comfort to the victim in the present case to know that, although he could have been seriously injured or killed if the defendant had followed through on his implied threat to shoot him in the neck at point blank range, he would have been in minimal danger if the defendant had been fifty feet away.

With respect to Justice Katz' argument that our interpretation would mean that a nail gun or a slingshot is a deadly weapon, we agree with Justice Borden that it is likely that the legislature intended for the phrase "weapon . . . from which a shot may be discharged" to include only items that ordinary persons would characterize as guns. Furthermore, if a nail gun or

inflicting death or serious bodily harm, it is a deadly weapon within the meaning of § 53a-3 (6), regardless of whether the shot is discharged by gunpowder.[13] We further conclude that the trial court in the present case reasonably could have concluded that the air pistol used by the defendant was designed for violence and was capable of causing death or serious bodily injury. Accordingly, we conclude that the air pistol was a deadly weapon.

The defendant claims, however, that the legislature's use of "identical language" in defining deadly weapon; General Statutes § 53a-3 (6); and firearm; General Statutes § 53a-3 (19);[14] necessarily implies that the definitions are coextensive. Section 53a-3 (19) defines a firearm as a "weapon, whether loaded or unloaded from which a shot may be discharged . . . ." The defendant argues that, because the same words are used in the two statutes, they must " 'be given the same meaning in each instance.' " *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 123, 830 A.2d 1121 (2003). The defendant further argues that, because all of the weapons listed as firearms in § 53a-3 (19), namely "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, [or] revolver," use gunpowder as their method of discharge, under the principle of ejusdem generis, a weapon must use gunpowder as a

a slingshot can kill or seriously injure a person, we fail to see how Justice Katz can escape this result by imposing a requirement that the item be designed for the type of violence that can cause death or serious injury to a person. We need not definitively resolve these questions in the present case, however.

[13] We do not suggest that every item that is designed for violence and is capable of causing death or serious bodily injury is a deadly weapon, regardless of whether it is listed in § 53a-3 (6). We conclude only that any weapon from which a shot may be discharged and that is capable of causing such harm is a deadly weapon.

[14] General Statutes § 53a-3 (19) defines " '[f]irearm' " as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ."

method of discharge to be considered a firearm. Thus, he argues, deadly weapons from which a shot can be discharged must be firearms. We disagree.

The defendant relies on *State* v. *Brown*, 259 Conn. 799, 809, 792 A.2d 86 (2002), in support of his argument that all firearms must use gunpowder. In *Brown*, the defendant was convicted of, inter alia, robbery in the first degree in violation of § 53a-134 (a) (4), and received an enhanced penalty pursuant to General Statutes § 53-202k.[15] Id., 801. He appealed from the judgment to the Appellate Court, which affirmed his conviction. Id., 805. We granted his petition for certification to appeal limited to the question of whether the trial court improperly had failed to define the term firearm when instructing the jury on the sentence enhancement provision of § 53-202k. Id. The defendant argued on appeal that the court's failure to instruct the jury on the statutory definition of firearm rendered the instruction constitutionally defective. Id., 808. We disagreed. We recognized that "it is generally preferable for a jury to be instructed on the statutory definition of a word where one exists . . . ." Id. We also recognized, however, that "[s]pecific words in a statute need not be defined if they are being used and understood in their ordinary meaning." Id. We then noted that § 53a-3 (19) provides that, "[f]irearm means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . . This definition requires that a firearm be (1) a weapon, with a list of examples, and (2) capable of

[15] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

discharging a shot. The commonly understood meaning of firearm, found in Merriam-Webster's Collegiate Dictionary (10th Ed.), is a weapon from which a shot is discharged by gunpowder . . . . *This commonly understood meaning of the word comprises the same two elements as the statutory definition—a firearm is a weapon capable of discharging a shot.* Therefore, the dictionary definition that we presume was applied by the jury and the definition found in § 53a-3 (19) are essentially the same." (Emphasis added; internal quotation marks omitted.) *State* v. *Brown,* supra, 809. Accordingly, we concluded that there was no constitutional violation. Id.

Thus, in *Brown,* we merely held that the jury, in the absence of an instruction from the trial court, could be presumed to have applied the dictionary definition of firearm, which included the two elements expressly required by statute, namely, that the weapon *discharge* a *shot.* There was no claim in that case that the gun used by the defendant was not a firearm because it did not discharge a shot by use of gunpowder. Any misunderstanding by the jury that a discharge by use of gunpowder was a requirement under the statute would, therefore, have been harmless. Accordingly, we reject the defendant's argument that we held in *Brown* that all firearms must be discharged by gunpowder. We further note that, in *Brown,* we referred to the dictionary definition of firearm only because the trial court had failed to provide the statutory definition of the term in its jury instructions, and only for the purpose of resolving whether the dictionary, or commonly used, definition was sufficiently dissimilar to the statutory definition as to affect the jury's deliberations. Id., 808–809. Our reference to the dictionary definition of the term under these circumstances does not indicate that, as a rule, this court considers the common meanings of terms

where a statutory definition exists and was relied on by the fact finder.

Even if it is assumed, however, that, because all of the weapons listed in § 53a-3 (19) are discharged by gunpowder, the principle of ejusdem generis would suggest that all firearms must be discharged by gunpowder, that would not mean that all deadly weapons that discharge shots must use gunpowder. In short, it does not logically follow from the fact that all firearms are deadly weapons that all deadly weapons that discharge shots must be firearms. As we have indicated, if the legislature had wanted to limit § 53a-3 (6) in this way, it could have done so expressly.

The defendant also relies on the genealogy and legislative history of the relevant statutes in support of his interpretation. He points out that the official commentary to § 53a-3, which was enacted in 1969 as part of the Penal Code; see Public Acts 1969, No. 828, § 3; states that "any *gun* 'from which a shot may be discharged,' whether loaded at the time or not, would be a 'deadly weapon.'" (Emphasis added.) Commission to Revise the Criminal Statutes, Penal Code Comments, supra, § 53a-3. In addition, the official commentary to § 53a-134 states that "[s]imple robbery is raised to robbery in the first degree on the basis of . . . being armed with a deadly weapon (i.e. a pistol). . . ." Id., § 53a-134. The statutory definition of firearm, which was enacted in 1975; Public Acts 1975, No. 75-380, § 1 (P.A. 75-380); includes pistols. See General Statutes § 53a-3 (19). Finally, the defendant points out that, when the legislature enacted the portion of P.A. 75-380 that is now codified at § 53a-3 (19), the legislative debate clearly indicated that the legislature understood firearms to be deadly weapons. See, e.g., 18 S. Proc., Pt. 5, 1975 Sess., p. 2293, remarks of Senator David M. Barry ("the only deadly weapon we're involved with in this [b]ill is a firearm"). The defendant argues that this history estab-

lishes that guns and pistols must be firearms in order to be deadly weapons.

We conclude, however, that this history establishes, at most, that all firearms are deadly weapons. As we have already indicated, it does not follow from the fact that all firearms are deadly weapons that all deadly weapons that discharge shots must be firearms. The legislative history of P.A. 75-380, now codified in part at § 53a-3 (19), indicates that the legislature believed that, although firearms were deadly weapons, they were more dangerous than other deadly weapons. See 18 H.R. Proc., Pt. 10, 1975 Sess., p. 4858, remarks of Representative Paul C. DeMennato ("[w]e have to make it perfectly clear to the crime element in our society that uses a firearm, which is potentially [50 percent] more lethal than any other weapon he can use, that when he goes out with that firearm in his hand, he's in trouble"). Thus, although both deadly weapons and firearms are designed for violence and are capable of inflicting death or serious bodily injury, firearms are limited to the most dangerous weapons and deadly weapons include a broader class.

The defendant further claims that the state and the trial court were both confused about the nature of the charges before the court rendered its verdict. At trial, the state conceded that, to be considered a firearm, a weapon must use gunpowder to discharge.[16] We also recognize that the state called the pellet pistol variously a "firearm," "gun," "pistol" and "weapon," and that only after closing arguments and before the court rendered its verdict did it become wholly clear that the defendant would be charged with robbery in the first degree while armed with a deadly weapon under § 53a-134 (a) (2), and not under § 53a-134 (a) (4), which would have

---

[16] As we have indicated, we express no opinion on this question in the present case.

required the state to prove that the defendant had committed the robbery with the aid of a firearm.[17] The defendant does not argue, however, that he was prejudiced by the confusion at trial and, therefore, that the state should be estopped from changing its tack on appeal to claim that the pellet gun may be a deadly weapon even though it is not a firearm. He merely argues that, as a matter of statutory interpretation, the fact that the state at trial called the pellet gun a firearm during trial means that a deadly weapon that discharges a shot must be a firearm. For the foregoing reasons, we disagree.

The judgment of the Appellate Court is affirmed.

In this opinion NORCOTT and ZARELLA, Js., concurred.

BORDEN, J., concurring. I agree with the result reached by the majority opinion affirming the conviction of the defendant, Raymond Hardy, of robbery in the first degree, and with much of the reasoning of that

---

[17] The trial transcript includes the following discussion:

"[The Prosecutor]: In speaking with [defense counsel] I think that, so he may adequately prepare for sentencing, the court needs to articulate, if [the defendant] is found guilty of § 53a-134 [a], [subdivision] (1), (2), (3) or (4), it sounded to me from the court's ruling it was [subdivision] (2). . . . But I just need—I think we just need that to be clear on the record.

"The Court: Sure. Let me go to the statutes so that we all know what we're talking about here. But I'm pretty sure about what I did but . . . I'll make sure that what my understanding is is exactly what . . . it is. [Section] 53a-134, I'm going right to the statute book. [Subdivision] (2), 'Robbery in the first degree: Class B felony.' Subsection (a) (2), references armed with a deadly weapon. Correct . . . ?

"[The Prosecutor]: Yes.

"The Court: All right. All right? Deadly weapon. That's my . . . finding.

"[The Prosecutor]: Thank you, Your Honor.

"[Defense Counsel]: Thank you, Your Honor.

"The Court: You're welcome.

"[The Prosecutor]: So [December 12], then, on all matters? [December 12] for imposition of sentence . . . .

"The Court: Very good."

opinion. I write separately, however, to provide some additional analysis that supports the result reached by the majority and that responds somewhat to the dissent.

I first note that the determinative issue presented in this certified appeal is whether "a 'deadly weapon' as defined in General Statutes § 53a-3 (6)[1] require[s] that a shot be discharged by gunpowder?" *State* v. *Hardy*, 272 Conn. 906, 863 A.2d 699 (2004). The defendant's sole argument in this regard is that the term "deadly weapon" is synonymous with the term "firearm," and that, under our decision in *State* v. *Brown*, 259 Conn. 799, 809, 792 A.2d 86 (2002), a firearm is a gun that discharges a shot by gunpowder. The defendant does not claim that the air pistol involved in this case is not a weapon. Rather, he argues only that, in order for the air pistol to be a deadly weapon, it must discharge a shot by gunpowder, not compressed air. I fully agree with the majority's reasoning in rejecting that argument. That reasoning is sufficient to answer the certified question in this case.

I part company, however, with both the majority and the dissent in their heavy emphasis on the reference in the commentary to the Penal Code (commentary) to a "deadly weapon" as requiring an inquiry into whether a particular weapon is "designed for violence."[2] Commission to Revise the Criminal Statutes, Penal Code

---

[1] General Statutes § 53a-3 (6) provides in relevant part: " 'Deadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. The definition of 'deadly weapon' in this subdivision shall be deemed not to apply to section 29-38 or 53-206 . . . ."

[2] I recognize, of course, the usefulness of the commentary to the interpretation of the language of the Penal Code, as do both the majority and the dissent in the present case. I also recognize the irony in the fact that I am questioning the degree of reliance that both the majority and dissent appear to place on that commentary, because, as the executive director of the commission to revise the Penal Code in 1963 through 1971, I was heavily involved in drafting both the Penal Code and its commentary.

Comments, Conn. Gen. Stat. Ann. § 53a-3 (West 2001) comments, p. 239. That language does not appear in the statute. As commentary, it should be used only to illuminate the meaning of the statutory language. Its usefulness as an interpretive tool, however, should not be transformed into language that itself must be interpreted as if it were a statutory element of the crime. In other words, it does not provide an additional set of words that themselves must be subject to our interpretive function. Rather, the commentary, albeit not as lucid in hindsight as it could have been, tells us that the drafters of the Penal Code and the legislature that adopted it considered all weapons from which a shot may be discharged *to be designed for violence* and that, therefore, if one were armed with such a weapon while committing a robbery, that would constitute robbery in the first degree in violation of General Statutes § 53a-134 (a) (2).[3] This is what was meant by the commentary's reference that the term " '[d]eadly weapon' is confined to those items designed for violence." Id.

This does not mean, however, that none of the commentary is useful in deciding this case. The commentary states: "The 1971 General Assembly eliminated the prior requirement, in the definition of 'deadly weapon' that a gun be loaded; thus, any gun 'from which a shot may be discharged,' whether loaded at the time or not, would be a 'deadly weapon.' " Id. This commentary indicates that, when the drafters and the legislature used the word "weapon" in the definition of "deadly weapon," they intended it to mean a "gun," of whatever type, from which a shot may be discharged. That intent is fully consistent with the structure of the robbery sections of

---

[3] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

the Penal Code, which elevates robbery to first degree if the perpetrator is armed with a "deadly weapon," namely, a gun from which a shot may be discharged, by whatever technology. This interpretation also answers the contention raised by the dissent that a broad definition of "deadly weapon" could include a sling shot. Under my definition, a sling shot would not be a "deadly weapon," not because the shot is discharged by other than gunpowder, but because it is not a "weapon" within the meaning of the statute. Moreover, to answer another question raised by the dissent, in my view a BB gun *would* be a deadly weapon.

To sum up, in my view, a "deadly weapon" within the meaning of § 53a-3 (6) means any gun from which a shot may be discharged, irrespective of whether the discharging power is gunpowder. It is not necessary to go though a case-by-case analysis of whether the type of gun is one "designed for violence." Of course, the gun must be a true gun, not a toy; and what is discharged must be a "shot," not, for example, a paintball. There may be future cases in which we will have to grapple with the questions of whether the device involved is a gun, and whether what is discharged is a shot. This case, however, does not present those questions. There is no question that the defendant's air pistol was a gun, and that the projectile discharged from it was a shot. The defendant does not contend otherwise. I therefore join the majority in affirming the judgment of the Appellate Court upholding the defendant's conviction of robbery in the first degree. See *State* v. *Hardy*, 85 Conn. App. 708, 719, 858 A.2d 845 (2004).

KATZ, J., dissenting. I agree with the majority's conclusion that the state need not demonstrate that a weapon utilizes gunpowder to discharge a shot in order to establish that it is a deadly weapon as defined by General Statutes § 53a-3 (6). The majority concludes

that a weapon from which a shot may be discharged is a "deadly weapon" pursuant to § 53a-3 (6) if it is designed for violence and is capable of inflicting death or serious bodily harm.[1] In accordance with the majority's conclusion then, the state, in order to prove robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), had the burden of proving beyond a reasonable doubt that the air gun found in the apartment of the defendant, Raymond Hardy, satisfied that definition. Although I agree with the majority's determination that to constitute a deadly weapon, an instrument must be (1) designed for violence and (2) capable of causing death or serious physical injury, I would conclude that an instrument is designed for violence only when the violence intended is the type of violence capable of causing death or serious physical injury to a person. Because the state did not prove that the Crosman model 1008 repeater $CO_2$ pellet pistol at issue in this case was designed for such violence, I disagree with the majority's determination that the trial court reasonably could have concluded that this air gun was a deadly weapon. Accordingly, I dissent.

"The United States Supreme Court has explicitly held that the due process clause requires that every fact

---

[1] Although the Penal Code does not provide a definition for "serious bodily harm," General Statutes § 53a-3 (4) defines " '[s]erious physical injury' " as a "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." In the absence of an alternative definition for "serious bodily harm," or any indication in the majority's analysis that the definitions would differ, I apply the statutory definition for serious physical injury.

The legislature does not define violence; nor does the majority. One dictionary includes the following definitions for violence: "[E]xertion of physical force so as to injure or abuse (as in effecting an entrance to a house)," "injury by or as if by distortion, infringement, or profanation" and "intense, turbulent, or furious and often destructive action or force." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). As I hope to demonstrate in this dissent, a simple application of this definition, divorced from the context of the Penal Code, would lead to absurd and unworkable results.

necessary to constitute the crime of which an accused stands charged must be proven beyond a reasonable doubt before a conviction. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 [1970]." (Internal quotation marks omitted.) *State* v. *Haddad*, 189 Conn. 383, 388–89, 456 A.2d 316 (1983). It is well established that, "[e]ach essential element of the crime charged must be established by proof beyond a reasonable doubt, and although it is within the province of the [trier] to draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture. . . . Where it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot constitutionally stand, as it is violative of due process under the fourteenth amendment. . . . [T]he burden rested upon the prosecution to prove the guilt of the accused, i.e., to prove each material element of the offense charged beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) Id., 387–88.

In reaching its determination that the trial court reasonably found the defendant guilty of robbery in the first degree under § 53a-134 (a) (2), the majority relies on the commentary to § 53a-3 (6); see Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-3 (West 2001); as well as case law to define deadly weapon and thereafter to conclude that the state established that, because the air gun in the present case was both designed for violence and capable of causing death or serious physical injury, it therefore was a deadly weapon. In adopting this definition, the majority recognizes that not all items capable of discharging a shot are designed for violence. It also recognizes that there are many guns capable of causing death or serious physical injury that were not designed for violence against persons but concludes that such guns nevertheless satisfy § 53a-3 (6) because

they were intended to cause damage or injury to their intended target. See footnote 12 of the majority opinion. Under the majority's reasoning, however, a nail gun designed to penetrate wood or a slingshot designed to strike a paper target or small animals could be considered to be designed for violence. To me, it challenges common sense to assume that the legislature had in mind violence to boards, paper targets, or even small animals—in other words, anything other than human beings—when it adopted the Penal Code, which solely addresses crimes against persons. See, e.g, *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 133, 848 A.2d 451 (2004) ("[i]t is well established that, '[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended' "). Therefore, although I agree with the majority's determination that to constitute a deadly weapon, an instrument must be capable of causing death or serious physical injury, I would conclude that an instrument is designed for violence only when the violence intended is the type of violence capable of causing death or serious physical injury to a person.[2]

---

[2] Under the majority's use of the phrase "designed for violence," proof that a slingshot was carried, without shot in a zipped backpack, and was never used or even referenced during a robbery, would elevate a robbery in the third degree pursuant to General Statutes § 53a-136 to robbery in the first degree, with five years of the resulting sentence to be without suspension or reduction. See General Statutes § 53a-134 (b). This is so because, if an instrument is deemed a "deadly weapon" under § 53a-3 (6), it need not be used to injure, it need not be displayed or even used to threaten during the course of the robbery, it may be loaded or unloaded, and the state need only show that it is operational. General Statutes §§ 53a-3 (6) and 53a-134 (a). Further, the penalty for robbery in the first degree, a class B felony, carries the additional requirement that the defendant "shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court." General Statutes § 53a-134 (b). To me, it challenges common sense to posit that the legislature intended such a result.

Recognizing that the focus of our disagreement is a narrow one, I begin with the meaning of the phrase "designed for." Although we previously have not considered the meaning of the phrase, courts have defined it essentially as the main purpose for which the item was created. See, e.g., *State* v. *Schaffer*, 202 Ariz. 592, 594 n.4, 48 P.3d 1202 (App. 2002) (prosthesis deemed not to be deadly weapon where " 'deadly weapon' " is defined to include " 'anything designed for lethal use' "; Ariz. Rev. Stat. § 13-105 [13] [2001]; and prosthesis, by definition, is not " 'designed for lethal use,' " but is designed as substitute body part); *Berry* v. *State*, 833 S.W.2d 332, 334 (Tex. App. 1992) (five inch long metal bolt sharpened on one end and wrapped with duct tape on other end deemed "deadly by design" when multiple witnesses testified that shank was designed to do harm to another person, weapon was capable of causing death, and there was no legitimate function for weapon; and when "deadly by design" defined pursuant to Texas Penal Code Annotated § 1.07 [a] [11] [A] [Vernon 1974], now codified at § 1.07 [a] [1], as either " 'a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury' "); see also *In re Robert A.*, 199 Ariz. 485, 487, 19 P.3d 626 (App. 2001) (flare gun not deadly weapon when, inter alia, no evidence in record indicated that flare gun was designed to be used to injure or kill someone); *Commonwealth* v. *Duxbury*, 449 Pa. Super. 640, 642–43, 674 A.2d 1116 (1996) (question of "intended use" is not whether appellant has proffered plausible lawful use for object, or whether circumstances of possession negated intent to use instrument unlawfully, but whether three inch knife concealed within pen has common lawful purpose within community); *Commonwealth* v. *Blake*, 413 Pa. Super. 416, 418–19, 605 A.2d 427 (1992) (pocket knife not designed as weapon in absence of description of size and shape of knife or blade to enable court to make such determination).

In applying its definition of deadly weapon to the present case and deciding that the trial court reasonably could have concluded that the air gun used in the robbery was designed for violence because it was intended to cause damage or injury to its intended target and was capable of causing death or serious physical injury, the majority relies on evidence establishing that the air gun used carbon dioxide cartridges as a propellant, was designed to shoot .177 caliber pellets[3] and was operational. It also relies on an operating manual for the air gun that was submitted by the state, which contained the following warning: "NOT A TOY. ADULT SUPERVISION REQUIRED. MISUSE OR CARELESS USE MAY CAUSE SERIOUS PHYSICAL INJURY OR DEATH. MAY BE DANGEROUS UP TO 400 YARDS (366 METERS)." Notably, however, three of the manual's four specific warnings as to such injuries exclusively concerned injury to the *user*.[4] Even more significant, the only use mentioned in the manual is target shooting. Indeed, the manual explains: "Your air-

---

[3] The operating manual for the air gun submitted into evidence pictured the .177 caliber pellets as cylindrical objects tapering in the middle and flat on both ends.

[4] Specifically, in addition to the general warning noted by the majority, the manual contains the following four warnings or cautions also printed in capital letters and red ink: (1) "[CARBON DIOXIDE ($CO_2$)] CYLINDERS MAY EXPLODE AT TEMPERATURES ABOVE 120 [DEGREES FAHRENHEIT]. DO NOT MUTILATE OR INCINERATE THEM. DO NOT EXPOSE THEM TO HEAT OR STORE THEM AT TEMPERATURES ABOVE 120 [DEGREES FAHRENHEIT]."; (2) "KEEP HANDS AWAY FROM ESCAPING $CO_2$ GAS. IT CAN CAUSE FROSTBITE IF ALLOWED TO COME IN CONTACT WITH SKIN."; (3) "USE .177 CALIBER PELLETS ONLY. NEVER REUSE PELLETS. USE OF ANY PELLET OTHER THAN .177 CALIBER CAN CAUSE INJURY TO YOU OR DAMAGE TO YOUR AIR PISTOL."; and (4) "KEEP THE AIR PISTOL ON SAFE UNTIL YOU ARE ACTUALLY READY TO SHOOT. THEN PUSH IT TO SAFE OFF."

Although these specific warnings suggest that the general warning was nothing more than a standard products liability waiver, I do not dispute that the air pistol at issue was capable, under limited circumstances, of causing serious injury or possibly death. See footnote 8 of this opinion (referencing product liability cases arising from use of air guns).

gun is designed for target shooting and is suited for both indoor and outdoor use." As the *only* evidence regarding intended use was the statements in the manual regarding target shooting, nothing in this record establishes that the air gun found in the apartment qualifies as a "deadly weapon" under § 53a-3 (6) in that it is designed for violence to humans.

The majority also notes that the state argued to the trial court that, "as a matter of common sense, the gun, particularly when used at close range, could be a deadly weapon and could cause serious physical injury."[5] To the extent, however, that the trial court may have relied on this argument, it clearly was an improper application of common knowledge.

Although it is certainly true that "[i]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence . . . [i]n considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life . . . ." (Internal quotation marks omitted.) *State v. Chapman*, 46 Conn. App. 24, 35, 698 A.2d 347, cert. denied, 243 Conn. 947, 704 A.2d 800 (1997), cert. denied, 523 U.S. 1063, 118 S. Ct. 1393, 140 L. Ed. 2d 652 (1998). It is also true, however, that "common knowledge encompasses only those things so patently obvious and so well known to the community generally, that there can be no question

---

[5] The trial transcript also contained the following exchange:

"The Court: . . . [The] manual for the [Crosman] pellet gun, if I'm not mistaken. I haven't—they fire at a rate of speed and have a key—they can kill, for example, small animals. We know that for a fact. Don't we? Don't we know that pellet guns can kill small animals?

"[State's Attorney]: I think we do make a common sense finding.

"The Court: Well, I can tell you from my own experience such things occur, you know."

or dispute concerning their existence." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 196, 869 A.2d 192 (2005) (*Katz, J.*, dissenting and concurring). "[C]ommon knowledge is not tantamount to a common belief that may be nothing more than a perception grounded in folklore, not reality." Id., 194 (*Katz, J.*, dissenting and concurring); see also *State* v. *Smith*, 273 Conn. 204, 211–14, 869 A.2d 171 (2005) (expert testimony regarding harmful effect to child when cocaine ingested not required because harmful physiological effects of cocaine are within knowledge and experience of typical juror, state law reflected determination that cocaine was dangerous drug, published court opinions highlighted threat to health when cocaine was hidden in mouth or swallowed, and potentially harmful effects of ingesting crack cocaine are subject of published news reports); *State* v. *Clark*, 260 Conn. 813, 822, 801 A.2d 718 (2002) (expert testimony on effects of smoking marijuana is not required when average juror would have been exposed, through observation, experience, acculturation and popular education, to sufficient facts to form reasoned conclusion).

Because the field of common knowledge is limited to obvious facts, it can be considered common knowledge that an air gun is designed for violence only when the question actually has been examined and the results are largely undisputed as well as widely distributed. The majority's conclusion that such common knowledge exists seems to rest on the premise that it is an obvious fact that the air gun at issue here, specifically, a Crosman model 1008 repeater $CO_2$ pellet pistol, and indeed all air guns, are designed for violence. Such a conclusion is unwarranted. Unlike the effects of marijuana smoking addressed in *State* v. *Clark*, supra, 260 Conn. 822, it cannot be said that the average fact finder in Connecticut has been exposed, through personal observation and experience, acculturation or popular

education, to the Crosman model 1008 repeater $CO_2$ pellet pistol, or any air gun, enough to be familiar with "obvious facts" sufficient to allow a determination that such instruments are designed for violence. Certainly it cannot be said that ownership of air guns is so widespread in this state at this point in time that most or even many people have a familiarity with air guns through personal experience or the experience of friends and family.

Turning to reference materials readily available to the public, I note that one encyclopedia describes an air gun as: "[A] small-caliber weapon, either a handgun or a shoulder weapon, from which pellets, bullets, or darts are discharged by the expanding force of compressed air or gas. Some air guns are little more than toys, others have considerable penetrating power." 1 Encyclopedia Americana, International Edition (Grolier, Inc., 1998) p. 383.[6] This article further explains that "[n]o form of air gun yet made has had enough power to propel a bullet to any considerable distance; thus, air guns have no military significance," and that "[t]opgrade air guns are accurate at short ranges and are particularly suitable for target practice, for exterminating such small pests as mice and rats, and for training in safe handling of firearms." Id. Similarly, another encyclopedia describes air guns as follows: "Most modern air guns are inexpensive BB guns (named for the size of the shot fired). The best of these develop about [one-half] the muzzle velocity of light firearms, are accurate enough for marksmanship training at ranges up to 100 feet . . . and can kill small game." 1 The New Encyclopaedia Britannica (15th Ed. 1998) p. 175. Thus, popular

---

[6] The Encyclopedia Americana, supra, p. 383, explains that there are two general types of air guns in popular use: one type is powered by air or carbon dioxide gas under pressure within the guns, and the second type is powered by air pressure created by the release of a powerful spring and plunger. These guns are comparable in power and accuracy. 1 The New Encyclopaedia Britannica (15th Ed. 1998) p. 175.

reference books do not add to the common knowledge that air guns are designed for violence to humans, but, rather, indicate that there are many types of air guns with varying capabilities, designed for various uses.

Indeed, one buyer's guide, listing more than *400* types of air guns, demonstrates the expansive variety of guns, with varying power and accuracy, that are encompassed in this category. See J. Walter, The Airgun Book (3d Ed. 1984). There is also a variety of shots available for use in the various air guns: "The target shooter, for example, selects stable, flat-head 'wadcutter' pellets to cut neat, easily gauged holes in his targets, while many fieldsmen prefer English-style round-heads, which perform better at long range—or the . . . pointed-head 'hunting' pellets which promise better penetration."[7] Id., p. 52. A brief history offered by the author indicates that air guns were designed for a range of activities, including organized target shooting at pubs and air gun competitions for youngsters. Id., p. 15.

In *State* v. *Smith*, supra, 273 Conn. 211–14, we also looked to published opinions as highlighting information said to be common knowledge. The Appellate Court has addressed whether an unloaded air gun was a dangerous instrument so as to establish robbery in the first degree and concluded that, unless it was used to threaten bludgeoning, it was not. *State* v. *Osman*, 21 Conn. App. 299, 573 A.2d 743 (1990), rev'd on other grounds, 218 Conn. 432, 589 A.2d 1227 (1991). In dicta, however, the Appellate Court asserted: "The pellet pistol used in the robbery is a weapon designed for violence. The weapon fits the definition of the term 'deadly weapon' at § 53a-3 (6). This term appears in § 53a-134

---

[7] Although certainly not common knowledge, this information would suggest that because the Crosman model 1008 repeater $CO_2$ pellet pistol found in the defendant's apartment utilized the flat head pellets, which are described as the type that are intended for short range target shooting, the gun was not designed for violence.

(a) (2). . . . If the defendant had been charged under [this section], the state would not have had to prove that the pistol was loaded at the time of the robbery. The only issue would have been whether the weapon was operable." Id., 307 n.3. I question the precedential value of the assertion that the pellet gun was designed for violence and, in light of the fact that it was completely unsupported by evidence or even analysis, I find that it sheds no more light on the matter than the conclusory findings of the trial court in the present case. See footnote 5 of this opinion; see also *State* v. *Padua*, supra, 273 Conn. 194–95 (*Katz, J.*, dissenting and concurring) (discussing difference between perception grounded in folklore and common knowledge).[8]

The majority also cites cases from other jurisdictions concerning air guns, but these do little to support the conclusion that it is common knowledge that air guns are designed for violence to humans.[9] In cases cited by

---

[8] Other published cases indicate that air guns are given to and used by children. See *Haesche* v. *Kissner*, 229 Conn. 213, 217, 640 A.2d 89 (1994) (product liability case arising out of eye injury occurring while fifteen and sixteen year olds used Crosman model 66 Powermaster .177 caliber pellet/ BB air rifle in activity called "war games" that involved hunting for and shooting at each other while wearing several layers of clothing for protection); *Vilcinskas* v. *Sears, Roebuck & Co.*, 144 Conn. 170, 171, 127 A.2d 814 (1956) (product liability case arising out of accident occurring when air rifle sold to ten year old accidentally discharged and caused injury). Although these cases may not reflect positively on the safety of air guns, they do indicate a general usage that belies the argument that these guns are designed mainly to do the type of violence capable of causing death or serious physical injury to a human.

[9] The definitions of deadly weapon applied in two of the cases did not include a requirement that a deadly weapon be designed or intended for violence—and indeed, the analysis applied was much closer to the analysis of circumstances that we would apply under § 53a-3 (7) defining dangerous instrument. Notably, the most relevant point to this discussion that may be taken from *People* v. *Lochtefeld*, 77 Cal. App. 4th 533, 538–40, 91 Cal. Rptr. 2d 778 (2000), and *Merriweather* v. *State*, 778 N.E.2d 449, 457 (Ind. App. 2002), goes not to whether air guns are designed for violence, but, instead, to whether knowledge regarding air guns is so common as to obviate the need for evidence. In both of these cases cited in the majority opinion, expert testimony was submitted regarding the capabilities of the particular

the majority wherein the definition of deadly weapon applied by the courts actually did include a requirement that the item was designed, made or adapted to cause death or serious injury and the factor was determinative, those cases are not persuasive in that one court never discussed the application of this standard, and the others provided only a cursory analysis of the issue. See *McCaskill* v. *State*, 648 So. 2d 1175, 1178 (Ala. Crim. App. 1994) (concluding that BB gun could be deadly weapon, defined by statute, to include anything " 'manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury,' " because it can cause serious injury to eye); *State* v. *Cordova*, 198 Ariz. 242, 243, 8 P.3d 1156 (App. 1999) (because pellet gun uses carbon dioxide cartridges to propel pellets and jury had opportunity to view pellet gun during its deliberations, evidence sufficient to establish air gun was deadly weapon when "deadly weapon" defined to include anything designed for lethal use, including "firearm," which was defined by Arizona Revised Statutes § 13-105 [17] as "any loaded or unloaded handgun, pistol, revolver, rifle, shotgun or other weapon which will or is designed to or may readily be converted to expel a projectile by the action of expanding gases"); *Campbell* v. *State*, 577 S.W.2d 493, 495–96 (Tex. Crim. App. 1979) (because air gun designed to fire .22 caliber projectile was capable of causing death of human being if fired at close range and gun was pointed at close range during robbery, it was found to be deadly weapon capable of causing serious injury and designed for that purpose); see also *Mitchell* v. *State*, 698 So. 2d 555, 560–62 (Fla. App. 1997) (unclear whether air gun was found to be deadly weapon or dangerous instrument when conviction was affirmed after court assessed likelihood

guns at issue and the type of capabilities that would be required to cause death or serious injury to a human, thereby acknowledging implicitly that such information is not a matter of common knowledge.

of injury from reasonable victim's point of view and air gun used to threaten).

In other cases addressing air guns used in crimes, however, fact finders have concluded that the air guns at issue were not designed for violence. See, e.g., *Holder* v. *State*, 837 S.W.2d 802, 808 (Tex. App. 1992) (although air pistol could shoot BB with muzzle velocity of 180 feet per second and thus was capable of penetrating human eye, expert witness testified that spring-piston BB or pellet pistol was not manifestly designed, made, or adapted for purpose of inflicting death or serious bodily injury and state therefore had to prove air pistol was loaded); *Mosley* v. *State*, 545 S.W.2d 144, 145 (Tex. Crim. App. 1976) (when state's expert testified that BB gun projectile could not penetrate skin, but that there was good probability it could cause loss of sight if victim were shot in eye and witness testified that air pistol used constantly misfired and, when it did fire, projectile had very low velocity and rarely went over five feet, unreasonable to conclude that weapon was " 'designed, made, or adapted for the purpose of inflicting death or serious bodily injury' "). Indeed, the latter two Texas cases are more persuasive because the fact finders in those cases were presented with expert testimony as to the specific air gun's capabilities. Moreover, in light of the differing conclusions drawn by fact finders regarding whether various types of air guns were designed for violence, I do not believe that, even if we were to search outside of Connecticut, it can be said to be common knowledge that all air guns generally, or the air gun in the present matter specifically, are designed for violence.[10]

---

[10] Moreover, I note that if we look within Connecticut, as we did in *State* v. *Smith*, supra, 273 Conn. 212–14, to state law to determine the existence of a legislative determination, evidencing common knowledge, we do not find a similar confirmation. It is not unlawful to own or to sell air guns and, indeed, the legislature expressly has recognized the use of such instruments by children in sporting events or by persons in sporting competitions. See General Statutes § 53-206 (b) (5) (although "BB. gun[s]" included in list of

I do not deny the possibility that evidence could be submitted at trial that conceivably could convince a fact finder that the Crosman model 1008 repeater $CO_2$ pellet pistol discharges the flat ended pellet used at a velocity so high that it supports the conclusion that the gun was designed for violence to humans.[11] Indeed, it may be that the velocity of 430 feet per second reported in the manual,submitted as evidence is of sufficient force that it would support a conclusion by a fact finder that an item capable of such power is designed mainly for the type of violence capable of causing death or serious physical injury to a human.[12] I strongly disagree, however, that it reasonably can be said to constitute

dangerous weapons that may not be carried on one's person, providing explicit exclusions for "the carrying of a BB. gun by any person taking part in a supervised event or competition of the Boy Scouts of America or the Girl Scouts of America or in any other authorized event or competition while taking part in such event or competition or while transporting such weapon to or from such event or competition").

[11] In this regard, I note General Statutes § 53a-217e (3), which prohibits negligent hunting, includes in the definition of " '[l]oaded hunting implement' " high velocity air guns that are charged with a projectile in the chamber or in a magazine that is attached to the air gun. Clearly, there are some air guns that are used in hunting and some even may be used in hunting game large enough to support the conclusion that they are designed for the type of violence capable of causing death or serious physical injury to a human.

[12] I note that, even if I were to accept the majority's interpretation of "designed for violence" to include objects designed to cause violence to small animals, common knowledge still cannot serve to establish whether the Crosman model 1008 repeater $CO_2$ pellet pistol is an air gun with the accuracy and velocity required for hunting small prey. One expert has explained that "[t]arget rifles may need to better 0.8 [accuracy unit] to be reasonable for value for money, or 0.5 [accuracy unit] to win competitions if the firer is good enough; good sporting guns probably need to surpass 1 unit; low-price plinking rifles 2.5; cheap pistols, 5 [accuracy unit] (though 5 units would mean that groups at 10m would be 50mm in diameter!)." J. Walter, supra, p. 61. The author explains that a gun with one accuracy unit achieves a one meter diameter group at 1000 meters, a 2.5 centimeter group at 25 meters or a centimeter group at a 10 meter distance. Id. "Plinking" is defined as "to shoot at especially in a casual manner." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). Where the air gun in this case falls within this range cannot reasonably be said to be common knowledge.

common knowledge.[13] Therefore, I respectfully dissent with respect to the majority's conclusion that the trial court in the present case reasonably could have concluded that the Crosman model 1008 repeater $CO_2$ pellet pistol was a deadly weapon, specifically, that it was designed for violence.

The state, however, requests, in the alternative, that we conclude that there was sufficient evidence to support the lesser charge of robbery in the third degree in violation of General Statutes § 53a-136.[14] Under the facts of this case, I agree that the state has established the elements of third degree robbery and I would instruct the trial court to render a judgment of conviction under that statute.

---

[13] "It is a fundamental tenet of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment." (Internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 316, 630 A.2d 593 (1993). Lenity certainly requires that, to the extent the definition of a deadly weapon does not clearly include the air gun in the present case, it should not be presumed, without proof, to be included.

[14] General Statutes § 53a-136 (a) provides: "A person is guilty of robbery in the third degree when he commits robbery as defined in section 53a-133."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

