**STATE of Minnesota, Respondent,**

v.

**Mitchell Dale COAUETTE, Appellant.**

No. C4–98–2286.

Court of Appeals of Minnesota.

Sept. 28, 1999.

Review Denied Dec. 14, 1999.

Mike Hatch, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, and Wayne H. Swanson, Polk County Attorney, Crookston, for respondent.

John M. Stuart, State Public Defender, Theodora Gaitas, Assistant State Public Defender, Minneapolis, for appellant.

Considered and decided by DAVIES, Presiding Judge, WILLIS, Judge, and SHUMAKER, Judge.

## OPINION

DAVIES, Judge.

Appellant Mitchell Dale Coauette appeals from a bench trial in which he was found guilty of drive-by shooting, two counts of felon in possession of a firearm, and second-degree assault. He contends the district court erred by determining that the paintball gun used to commit the alleged offenses qualified as a "firearm" and a "dangerous weapon." We agree and reverse.

## FACTS

Appellant Mitchell Dale Coauette and a companion purchased paintballs and two paintball guns from a sporting goods store in Crookston. Paintball guns are powered by carbon dioxide cartridges.

Later the same day, as appellant and three others drove around Crookston, appellant fired a paintball from the car. The paintball hit a 14–year–old girl about 50 feet from the car. As a result, her cheek was swollen and scratched, but she did not require medical care. Paint splattered on her cheek, hair, and coat.

The state charged appellant, who was then age 19 and on probation for burglary, with: (1) drive-by shooting in violation of Minn.Stat. § 609.66, subd. 1e (a) (1998); (2) felon in possession of a firearm in violation of Minn.Stat. § 609.165, subd. 1b(a) (1998); (3) felon in possession of a firearm in violation of Minn.Stat. § 624.713, subd. 1(b) (1998); and (4) assault in the second-degree (assault with a dangerous weapon) in violation of Minn. Stat. § 609.222, subd. 1 (1998).

Appellant moved to dismiss the complaint on probable cause grounds, asserting that the paintball gun was neither a "firearm" nor a "dangerous weapon." One or the other is a necessary predicate for each of the convictions. The court denied the motion.

Appellant waived his right to a jury trial and agreed to a bench trial on a stipulated record. *See State v. Lothenbach*, 296 N.W.2d 854, 856 (Minn.1980) (stating that, for judicial economy, defendant may plead not guilty and then submit stipulated record for bench trial). The court found appellant guilty on all counts, but imposed judgment and sentence only for the first count of felon in possession of a firearm and for second-degree assault. This appeal followed.[1]

## ISSUES

I. Is a paintball gun a "firearm" within the meaning of the drive-by shooting and felon-in-possession statutes?

II. Is a paintball gun, as designed and manufactured, inherently within the statutory definition of "dangerous weapon"?

III. Did appellant use the paintball gun in a manner that made it a "dangerous weapon"?

## ANALYSIS

■ This case turns, in its entirety, on statutory interpretation. Statutory interpretation is a question of law, which we review de novo. *State v. Zacher*, 504 N.W.2d 468, 470 (Minn.1993). The objective of statutory interpretation is to ascertain and effectuate the intent of the legislature. Minn.Stat. § 645.16 (1998); *State v. Mayard*, 573 N.W.2d 707, 709 (Minn. App.1998), *review denied* (Mar. 19, 1998).

No fact is disputed. The case was tried on a stipulated record. There is agreement on the type of paintball gun ("68 caliber pump-action $CO_2$ powered"), on the risks involved in its use, on the manufacturer's warnings, on the use intended by the manufacturer, and on how appellant used it.

### I.

■ This case presents issues of first impression in Minnesota: whether a paintball gun fits the definition of "firearm" as used in the drive-by shooting statute and the felon-in-possession statutes, and whether it fits the statutory definition of "dangerous weapon" for purposes of second-degree assault.

This is not, however, the first time an appellate court has undertaken to determine what constitutes a "firearm," a term

---

1. Generally, only the two counts on which appellant was formally adjudicated and sentenced would be before the court. But for the efficient administration of justice we address all four counts. *See* Minn. R.Crim. P. 28.02, subd. 11 (appellate court may review any matter as interests of justice may require).

**446**

that is not defined in the criminal code.[2] In *State v. Seifert,* the supreme court, as one of three bases for upholding an aggravated robbery conviction, held that a $CO_2$ BB pistol qualified as a "firearm." 256 N.W.2d 87, 88 (Minn.1977). The court concluded that, to further legislative intent, "firearm" should be "defined broadly to include guns using newer types of projectile propellants and should not be restricted in meaning to guns using gunpowder." *Id.* In support of its conclusion, the court cited a provision of the fish and game laws that defined "firearm" as "any gun from which shot or a projectile is discharged by means of an explosive, *gas, or compressed air.*" *Id.* (quoting Minn. Stat. § 97.40, subd. 34 (1976)) (emphasis added).

In *State v. Newman,* this court used the definition from *Seifert* to conclude that a high-velosity air gun, which fired BBs, qualified as a "firearm" under the drive-by shooting statute. 538 N.W.2d 476, 477–78 (Minn.App.1995), *review denied* (Minn. Nov. 30, 1995). The court noted that the legislature had, since *Seifert,* reenacted the criminal code without adding a general definition of "firearm" and concluded that it had, therefore, presumptively adopted the supreme court's expansive *Seifert* definition. *Id.* at 478.[3]

The district court in this case, following *Seifert* and *Newman,* ruled that a paintball gun qualified as a "firearm," for it is a "gun that discharges * * * a projectile by means of compressed air or gas." We conclude, however, that the *Seifert* "air gun" definition is incomplete by itself; the definition must be further refined to avoid creating criminal offenses not contemplated by the legislature. *See State v. Haas,* 280 Minn. 197, 200–01,159 N.W.2d 118, 121

(1968) (broad definition of a term inappropriate if definition creates crimes not contemplated by legislature).

Attention must be paid not just to the propellant (explosive, gas, or compressed air), but also to the purpose of the projectile the gun is designed to discharge. For example, the legislature cannot have intended that using $CO_2$ canisters or compressed air to shoot confetti from a clown car in the Aquatennial Parade constitutes a drive-by shooting. Nor can the legislature have intended that using a nail gun for its intended purpose is wielding a firearm or dangerous weapon. Even a device to expel projectiles by an explosive propellant may not constitute a firearm, for the legislature could not have intended that the tubes for firing Fourth of July and state fair fireworks should be considered firearms. *See* Minn.Stat. § 645.17(1) (1998) (legislature does not intend absurd results). Yet fireworks tubes, and confetti and nail guns (and "Super Soakers ™" and Nerf ™ guns, too), all would qualify under a definition of the term "firearm" that looks only to the propelling force. We must, therefore, in this case also take note of the purposes a paintball gun and paintballs are designed to achieve. *See State v. Newstrom,* 371 N.W.2d 525, 529 (Minn. 1985) (courts can place limiting constructions on terms of a statute, provided limitation is consistent with legislative intent).

In contrast to *Seifert* and *Newman,* in which the air guns were designed to shoot BB pellets that would pierce and harm the objects struck—whether bird, rodent, or human—we take judicial notice of the fact that the gun here was designed for use in a game and that its projectiles are liquid-paint capsules designed to burst on impact,

---

2. Although courts can and have pieced together a definition of "firearm" for use in the criminal code, this case, as have others, indicates the need for the legislature to craft a clarifying amendment to Minn.Stat. ch. 609, with a focus on whether the meaning of "firearm" can be precisely understood in various sections of that chapter.

3. When a court of last resort has construed the language of a statute, the legislature is deemed to intend that the language be given the same construction in subsequent statutes on the same subject matter. Minn.Stat. § 645.17(4) (1998). *See also State v. Gorman,* 546 N.W.2d 5, 8–9 (Minn.1996) (prior judicial interpretation gives guidance).

rather than to pierce. Of course, a paintball may break skin or destroy eyes (as can a baseball or snowball or rubber-band-launched paper clip). But, like those items, a paintball is not intended or designed to cause, in ordinary use, any harm at all. And a paintball has nothing like the destructive capacity of a bullet or BB. Therefore, the gun that fires the paintball does not—as a matter of statutory interpretation—constitute a "firearm." *See Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985) (construction of statute is question of law).

The trial court thus erred in finding appellant guilty of drive-by-shooting and of felon in possession of a firearm.

## II.

■ The district court also found appellant guilty of second-degree assault, ruling that the paintball gun constituted a "dangerous weapon." In Minn.Stat. § 609.02, subd. 6 (1998), a "dangerous weapon" is defined to include a "firearm." But, as discussed above, a paintball gun is not a firearm. "Dangerous weapon" is, in that section, also defined to include any "device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." *Id.*

For what use are paintball guns intended? They are designed and manufactured to launch paintballs. And paintballs are intended and designed to break on contact and simply—as part of the game—splash a dose of nontoxic liquid paint on the human target. A paintball gun is not—by design or intent—"calculated or likely to produce death or great bodily harm."

The state bases its argument that a paintball gun is a dangerous weapon, in part, on the manufacturer's warnings concerning the risks that arise from improper use. If such warnings make a product a dangerous weapon, then cars and ladders and fishing tackle and thousands of other potentially dangerous products are also dangerous weapons. The manner of use intended, not warnings, make weapons dangerous.[4]

It is worth noting that both "firearm" and "dangerous weapon" have two aspects. Each has an adjectival aspect, "fire" and "dangerous." And each—more significantly—also has a noun aspect, "arm"[5] and "weapon."[6] If not an "arm," an item is not a firearm. And if an item, as designed or used, is not a "weapon," it is not a "dangerous weapon." A paintball gun is not any kind of weapon, *except a play weapon* for use in *pretend combat.*

A paintball gun is not inherently a "dangerous weapon."

## III.

■ Ordinary objects can, however, be transformed into dangerous weapons. *State v. Trott*, 338 N.W.2d 248, 252 (Minn. 1983). But to be so transformed an object must not just be dangerous, it must also be used in a manner calculated to cause great bodily harm. *See, e.g., id.* (three-foot-long board is dangerous weapon when used to repeatedly beat victim); *State v. Moyer*, 298 N.W.2d 768, 770 (Minn.1980) (gasoline is dangerous weapon when intentionally poured and lit in sole exit of apartment in attempt to kill occupants); *State v. Mings*, 289 N.W.2d 497, 498 (Minn.1980) (boot is dangerous weapon when used to kick victim repeatedly in head and chest).

**4.** This warning, from an egg carton, certainly does not make eggs "dangerous weapons."

"SAFE HANDLING INSTRUCTIONS
Always keep eggs refrigerated.
Wash hands before and after handling.
Cook thoroughly. Do not consume raw.
Keep hot foods hot and cold foods cold."

**5.** An "arm" is defined as "[A] weapon, especially a firearm * * *." *The American Heritage Dictionary* 100 (3d ed.1992).

**6.** A "weapon" is defined as "[A]n instrument of attack or defense in combat, as a gun, missile, or sword." *The American Heritage Dictionary* 2022 (3d ed.1992).

Appellant, by launching the paint-ball out the car window, in the words of defense counsel, discharged the gun "in about as reckless a manner as possible." But defense counsel found the correct word—reckless—for there was in the stipulated record *no evidence* that appellant used the gun in a manner calculated to cause great bodily harm. The evidence in the stipulated record was that he intended to splash his unsuspecting target with washable paint. And he did so. His actions, while risky and reproachable and reckless, did not transform the paintball gun—a device used in a popular game—into a "dangerous weapon." [7]

Had there been evidence that appellant intentionally shot the paintball into the victim's face with intent to harm her, there would be some basis to treat the paintball gun as a dangerous weapon "in the manner it is used." Here, there is no such evidence.

### DECISION

A paintball gun is not a "firearm." The district court, therefore, erred in finding appellant guilty of drive-by shooting and being a felon in possession of a firearm. The court also erred in ruling that the paintball gun was a dangerous weapon and in finding appellant guilty of second-degree assault. The paintball gun was not designed as a weapon calculated or likely to harm and it was not used by appellant in a manner that transformed it into a "dangerous weapon."

**Reversed.**

SHUMAKER, Judge (concurring specially).

*State v. Seifert*, 256 N.W.2d 87, 88 (Minn.1977), held that the legislature intended a broad definition of "firearm," one not restricted to weapons using gunpowder. In *State v. Newman*, 538 N.W.2d

476, 478 (Minn.App.1995), *review denied* (Minn. Nov. 30, 1995), we concluded that the legislature presumptively adopted the expansive definition in *Seifert*. *See also Western Union Tel. Co. v. Spaeth*, 232 Minn. 128, 132, 44 N.W.2d 440, 442 (1950) ("reenactment of a statute without change, after construction * * * by the court, presumptively constitutes an adoption of such construction").

One could make a case that a paintball gun, which discharges a potentially harmful paint pellet through $CO_2$ power, is a firearm under the expansive definition of the term. The district court made such a case. But, as the majority aptly points out, if the expansive definition is applied to every device that discharges a projectile of some sort, the logical result would be the criminalization of various toys and tools. That would be absurd and could not be what the legislature intended.

I am not persuaded that the demarcation between a firearm and a nonfirearm should depend on the purpose of the projectile the device is designed to discharge, as the majority holds. I do agree, however, that the serious adult toy called the paintball gun is not the kind of device the legislature reasonably intends to classify as a firearm under the criminal law. If used properly, the gun will not cause injury, nor is it intended to do so.

If we were to classify a paintball gun as a firearm, we would set a precedent that ineluctably would draw into its ambit virtually any device that discharges a projectile.

It is the legislature's prerogative and responsibility to fashion an appropriate, comprehensive definition of firearm for the criminal law. Justice is not served by relying on the courts to create a definition piecemeal as cases arise.

---

**7.** Our decision does not, of course, preclude paintball-based civil liability in the right circumstances.