## STATE OF CONNECTICUT *v.* LAWRENCE GRANT
(SC 18177)

Rogers, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 20, 2008—officially released November 10, 2009

*Neal Cone*, senior assistant public defender, for the defendant (appellant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, former state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the state (appellee).

*Opinion*

PALMER, J. This appeal requires us to decide whether the state may establish that a BB gun is a "firearm" for purposes of General Statutes § 53-202k,[1] which provides for the imposition of a mandatory five year term of imprisonment on any person who uses or is armed with and threatens the use of a firearm in the commission of a class A, B or C felony.[2] Following a jury trial, the

[1] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[2] We note that, in *State* v. *Dash*, 242 Conn. 143, 698 A.2d 297 (1997), this court concluded that "§ 53-202k is a sentence enhancement provision and not a separate crime." Id., 150. In the present case, both the state and the defendant, in their briefs to this court, refer to the defendant's "conviction" under § 53-202k or the fact that the defendant was "convicted" under § 53-202k. In the interest of consistency, we refer to the finding of the jury with respect to the defendant's violation of § 53-202k as a "conviction," albeit with the recognition that it is not a separate crime.

defendant, Lawrence Grant, was convicted of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4)[3] and 53a-49 (a),[4] commission of a class A, B or C felony with a firearm, namely, a BB gun, in violation of § 53-202k, and carrying a dangerous weapon in violation of General Statutes § 53-206.[5] On appeal,[6] the defendant claims that the evidence that he was armed with and threatened the use of a BB gun in the commission of a class A, B or C

[3] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[4] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[5] General Statutes § 53-206 provides in relevant part: "(a) Any person who carries upon his or her person any BB. gun . . . shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . .

"(b) The provisions of this section shall not apply to . . . (5) the carrying of a BB. gun by any person taking part in a supervised event or competition of the Boy Scouts of America or the Girl Scouts of America or in any other authorized event or competition while taking part in such event or competition or while transporting such weapon to or from such event or competition; and (6) the carrying of a BB. gun by any person upon such person's own property or the property of another person provided such other person has authorized the carrying of such weapon on such property, and the transporting of such weapon to or from such property."

[6] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

felony was insufficient to support his conviction under § 53-202k. In support of his claim, the defendant contends that only a weapon that discharges a shot by gunpowder constitutes a firearm under General Statutes § 53a-3 (19), which defines "firearm" for purposes of our Penal Code as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged," and that, because a BB gun does not discharge a shot by gunpowder, it is not a firearm as a matter of law. We reject this claim and, accordingly, affirm the judgment of the trial court.[7]

The jury reasonably could have found the following facts. At approximately noon on June 19, 2005, the victim, Eric Ruiz, was walking on Stratford Avenue in Bridgeport in the direction of his mother's house after visiting a convenience store on the corner of Stratford and Hollister Avenues (corner store). The defendant was walking ahead of him, in the same direction, wearing a large, black, Afro-style wig. As the victim walked past the defendant, the defendant stuck an object into the victim's back and demanded all of his money. Although the victim did not see the object that had been pressed into his back, the defendant told him that it was a gun. The defendant also told the victim that if he moved or attempted to run, he would shoot him. The defendant then directed the victim to an open car in a nearby parking lot. As they approached the car,

---

[7] The defendant also claims that he is entitled to a new trial on the charge of attempt to commit robbery in the first degree on the ground that the trial court's refusal to instruct the jury that a weapon is not a "firearm" within the meaning of § 53a-3 (19) unless it discharges a shot by gunpowder necessarily caused the jury to be misled with respect to the element of § 53a-134 (a) (4) requiring proof that the defendant displayed or threatened the use of what he represented by his words or conduct to be a firearm. See footnote 3 of this opinion. In light of our rejection of the defendant's contention that a "firearm," as defined by § 53a-3 (19), must discharge its shot by gunpowder, the defendant also cannot prevail on this claim.

the victim told the defendant that he had no money and that, "[i]f you are going to shoot me, just do it; that's my house next door." At that moment, a group of people began walking toward the two men, which prompted the defendant to flee.

After the defendant fled, the victim entered his mother's house. A short time later, while looking out the window, he noticed that the defendant had returned and was kicking the back of the car of the victim's mother. At this time, however, the defendant was not wearing a wig. The victim called the police, and, when the responding officer, Raymond Ryan, arrived soon thereafter, the victim gave him a description of the defendant. As Ryan was leaving the house of the victim's mother, a woman arrived and informed him that she had just seen the defendant standing near the corner store. Ryan immediately got into his patrol car and drove to the corner store. As he was exiting his vehicle, Ryan saw the defendant walking nearby. At that moment, another police officer arrived, and he and Ryan approached the defendant. While doing so, they observed the defendant bend down and grab his right leg. Concerned that he might be reaching for a gun, Ryan grabbed the defendant's right hand and the other officer grabbed the defendant's left hand. They then placed the defendant against a wall and patted him down. During the patdown, Ryan discovered a BB gun in the waistband of the defendant's pants, which Ryan seized.

The defendant then was handcuffed and placed under arrest. Before transporting him to police headquarters, however, the officers took the defendant to the victim's house, where the victim identified him as the person who had attempted to rob him. After learning that the defendant had borrowed his mother's car earlier that day, the police located the car and discovered a large, black, Afro-style wig on the front seat. Thereafter, the defendant was charged with attempt to commit robbery

in the first degree, commission of a class A, B or C felony with a firearm, that is, the BB gun that the police had found in the defendant's possession at the time of his arrest, and carrying a dangerous weapon.

The defendant's case subsequently proceeded to trial. At trial, the state adduced testimony from Marshall Robinson, a firearms expert. According to Robinson, the weapon in the defendant's possession at the time of his arrest was an operable Marksman Repeater spring-loaded air gun designed to shoot .177 caliber steel BBs. Robinson further testified that the BB gun was capable of discharging a shot that could cause serious bodily injury. At the conclusion of the trial, the jury found the defendant guilty as charged. The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective term of imprisonment of seventeen years. With respect to the charge of commission of a class A, B or C felony with a firearm in violation of § 53-202k, the court sentenced the defendant to a prison term of five years, to be served consecutively to the twelve year prison sentence imposed by the court for the underlying felony, namely, attempt to commit robbery in the first degree, as § 53-202k requires.[8] This appeal followed.

On appeal, the defendant claims that the evidence was insufficient to support his conviction under § 53-202k. Specifically, the defendant contends that the BB gun that the state proved that he had used in connection with his attempted robbery of the victim is not a firearm within the meaning of § 53-202k because, under the applicable definitional provision of the Penal Code, § 53a-3 (19), a gun is not a firearm unless it uses gunpowder to discharge its shot, and it is undisputed that a BB gun does not use gunpowder. We disagree with the defendant.

---

[8] The court imposed a two year concurrent prison sentence for the defendant's conviction of carrying a dangerous weapon.

Whether a BB gun constitutes a firearm under § 53a-3 (19) presents a question of statutory interpretation over which our review is plenary. See, e.g., *Rivers* v. *New Britain*, 288 Conn. 1, 10, 950 A.2d 1247 (2008). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 10–11.

We turn first, therefore, to the relevant statutory language. General Statutes § 53-202k provides for a mandatory, consecutive, nonsuspendible five year prison term for "[a]ny person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3 . . . ." General Statutes § 53a-3 (19), in turn, defines "firearm" as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ." Thus, § 53a-3 (19) defines "firearm" as a "weapon . . . from which a shot may be discharged" without reference to the use of gunpowder. Under the express terms of § 53a-3 (19), it therefore would appear that a gun capable of firing a shot is a firearm irrespective of whether the

gun discharges the shot by use of gunpowder or by some other means.

Recently, in *State* v. *Hardy*, 278 Conn. 113, 130, 896 A.2d 755 (2006), this court considered identical statutory language and arrived at that very conclusion, that is, that a "weapon . . . from which a shot may be discharged" includes weapons that discharge their shots without the use of gunpowder. General Statutes § 53a-3 (19). In *Hardy*, after a trial to the court, the court found the defendant, Raymond Hardy, guilty of robbery in the first degree in violation of § 53a-134 (a) (2).[9] *State* v. *Hardy*, supra, 115. Specifically, the court found that Hardy had been involved in the robbery of a taxicab driver and that a deadly weapon, namely, an air pistol, had been used in that robbery.[10] See id., 116–17. The Appellate Court affirmed Hardy's conviction of first degree robbery; *State* v. *Hardy*, 85 Conn. App. 708, 719, 858 A.2d 845 (2004); and we granted his petition for certification to appeal limited to two issues, one of which was whether a gun is a "deadly weapon" within the meaning of General Statutes § 53a-3 (6),[11] which defines "deadly weapon" in relevant part as "any weapon, whether loaded or unloaded, from which a shot may be discharged," even if the gun does not discharge its shot by gunpowder. See *State* v. *Hardy*, 272 Conn. 906, 863 A.2d 699 (2004).

[9] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[10] The evidence established that the air pistol used carbon dioxide cylinders as a propellant and was designed to shoot .177 caliber pellets. *State* v. *Hardy*, supra, 278 Conn. 117–18.

[11] General Statutes § 53a-3 (6) provides in relevant part: " 'Deadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. . . ."

On appeal to this court, Hardy raised the following argument in support of his claim that only guns that discharge their shots by gunpowder are deadly weapons. He reasoned, first, that, "because all of the weapons listed as firearms in § 53a-3 (19), namely, 'any sawed-off shotgun, machine gun, rifle, shotgun, pistol, [or] revolver,' use gunpowder as their method of discharge, under the principle of ejusdem generis,[12] a weapon must use gunpowder as a method of discharge to be considered a firearm." *State* v. *Hardy*, supra, 278 Conn. 128–29. Hardy further asserted that, because subdivisions (6) and (19) of § 53a-3 define "deadly weapon" and "firearm," respectively, by use of "identical language," that is, both provisions include within their purview "weapon[s] . . . from which a shot may be discharged"; (internal quotation marks omitted) id., 128; the two provisions "must be given the same meaning in each instance." (Internal quotation marks omitted.) Id. Hardy thus argued that a weapon qualifies as a "deadly weapon" for purposes of § 53a-3 (6) only if it discharges its shot by gunpowder. See id., 128–29.

We rejected the construction of § 53a-3 (6) advocated by Hardy without deciding whether a "firearm" under § 53a-3 (19) must use gunpowder to discharge its shot. See id., 130–31. In doing so, we explained that "the legislature has defined deadly weapon to mean any *weapon* from which a *shot* may be *discharged*," and that Hardy had not claimed "that the air gun [he used during the robbery] was not a weapon or that it did not fire shots." (Emphasis in original.) Id., 120. Relying

---

[12] "The principle of ejusdem generis applies when '(1) the [clause] contains an enumeration by specific words; (2) the members of the enumeration suggest a specific class; (3) the class is not exhausted by the enumeration; (4) a general reference [supplements] the enumeration . . . and (5) there is [no] clearly manifested intent that the general term be given a broader meaning than the doctrine requires.' 2A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 47.18." *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 297, 685 A.2d 305 (1996).

heavily on the "plain [statutory] language," we further observed that § 53a-3 (6) "does not require that the shot be discharged by gunpowder. Rather, the statute refers to *any* weapon, whether loaded or unloaded . . . from which a shot may be discharged . . . . Had the legislature intended to include in its definition only those weapons that discharged by use of gunpowder, it could have done so expressly through the language of the statute." (Emphasis in original; internal quotation marks omitted.) Id.

Guided by our analysis and construction of § 53a-3 (6) in *Hardy*, we reach the same conclusion with respect to the meaning of § 53a-3 (19). The legislature broadly included within the scope of § 53a-3 (19) those weapons "from which a shot may be discharged . . . ." As we explained in *Hardy* with reference to language defining "deadly weapon" for purposes of § 53a-3 (6) that is identical to the language of § 53a-3 (19), the legislature readily could have restricted the term "firearm" in § 53a-3 (19) to those guns that use gunpowder to discharge their shots. The fact that the legislature elected not to do so is strong evidence that it did not intend to limit the term in that manner. See, e.g., *Stitzer* v. *Rinaldi's Restaurant*, 211 Conn. 116, 119, 557 A.2d 1256 (1989) (legislature knows how to use limiting terms when it chooses to do so). Furthermore, although not dispositive of the issue, our conclusion is buttressed by the fact that, ordinarily, the same or similar language in the same statutory scheme will be given the same meaning. E.g., *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 282, 777 A.2d 645 (2001); see also *State* v. *Rivera*, 250 Conn. 188, 201, 736 A.2d 790 (1999) ("in the absence of persuasive evidence to the contrary, we may presume that a word used in different parts of the same statutory scheme has the same meaning").

We acknowledge that the principle of ejusdem generis; see footnote 12 of this opinion; provides some support for the interpretation of § 53a-3 (19) that the defendant urges us to adopt. We are not persuaded, however, that the doctrine is controlling in the present case. Although each of the guns specifically enumerated in § 53a-3 (19) uses gunpowder to discharge its shot, the statutory language at issue is expansive. As we observed in *Hardy*, moreover, that language is as plain as it is broad. See *State* v. *Hardy*, supra, 278 Conn. 120.

Finally, as this court previously has noted, the "commonly understood meaning of 'firearm,' found in [the tenth edition of] Merriam-Webster's Collegiate Dictionary . . . is 'a weapon from which a shot is discharged *by gunpowder* . . . .' " (Emphasis added.) *State* v. *Brown*, 259 Conn. 799, 809, 792 A.2d 86 (2002). It is reasonable to presume that the legislature was well aware of this commonly understood meaning of firearm when, for purposes of the Penal Code, it defined the term broadly, without reference to gunpowder, as a "weapon . . . from which a shot may be discharged . . . ." General Statutes § 53a-3 (19). "Ejusdem generis . . . is merely an axiom of statutory construction, not an inviolate rule of law; and, like all such axioms, it provides a guideline to legislative meaning, but it cannot displace the result of careful and thoughtful interpretation." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 703 n.34, 855 A.2d 212 (2004). That process of interpretation leads us to conclude that a BB gun does not fall outside the definitional purview of § 53a-3 (19) merely because it operates without gunpowder. Accordingly, the defendant cannot prevail on his claim that the evidence adduced by the state was insufficient to establish that the BB gun he used in connection with his attempted robbery of the victim was a firearm for purposes of § 53a-3 (19) and that

it therefore was insufficient to support his conviction under § 53-202k.

The judgment is affirmed.

In this opinion the other justices concurred.