******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* RAMON LOPEZ
## (SC 20601)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court revoking his probation. The defendant previously had been convicted of two felony offenses and received a suspended sentence and five years of probation. The conditions of the defendant's probation prohibited him from violating any state or federal criminal law and from possessing any "firearm," as that term was defined by statute (§ 53a-3 (19)). While the defendant was serving his term of probation, he was arrested and charged with criminal possession of a firearm after the police found an airsoft pellet gun in his residence while executing a search warrant. In light of that arrest, the defendant was charged with violating the conditions of his probation. The court held an evidentiary hearing, at which a detective, W, testified that the airsoft pellet gun functioned as intended by its manufacturer in that it used air to push round, plastic projectiles out of the barrel. In response to a question from the court, however, W could not say whether it was capable of discharging a projectile with enough velocity to "put a person's eye out." At the close of evidence, defense counsel moved for, inter alia, a finding of no violation of probation, claiming that the state had failed to establish that the airsoft pellet gun was a firearm within the meaning of § 53a-3 (19), which defines "firearm" in relevant part as "any . . . weapon . . . from which a shot may be discharged . . . ." The court denied that motion and, instead, found that the airsoft pellet gun was a firearm under § 53a-3 (19) because it was capable of discharging a shot, namely, a six millimeter pellet. Accordingly, the court concluded that the defendant had violated the conditions of his probation prohibiting him from violating the law and possessing a firearm, and rendered judgment revoking the defendant's probation, from which the defendant appealed. *Held* that the evidence was insufficient to support the trial court's factual finding that the airsoft pellet gun found in the defendant's residence was a firearm within the meaning of § 53a-3 (19), and, accordingly, this court reversed the trial court's judgment and remanded the case with direction to find no violation of probation and to render judgment in accordance with that finding: pursuant to this court's previous construction of the phrase "weapon . . . from which a shot may be discharged," as used in § 53a-3, the state, in order to prove that an instrument is a weapon capable of discharging a shot, must produce sufficient evidence to establish that it was designed for violence and that it was capable of inflicting death or serious bodily harm; in the present case, there was no evidence establishing the purpose for which the airsoft pellet gun was designed, and, in the absence of such evidence, it was pure speculation as to whether it was a toy designed for recreational use or an instrument designed for violence; moreover, the state failed to present any evidence from which it reasonably could be inferred that the airsoft pellet gun in this case was capable of inflicting death or serious bodily harm, especially in light of W's inability to say whether it discharged its pellets at a velocity sufficient to injure a person by, for example, putting his or her eye out; accordingly, the trial court's factual finding that the airsoft pellet gun was a weapon capable of discharging a shot for the purpose of the definition of "firearm" under § 53a-3 (19) was clearly erroneous.

Argued December 15, 2021—officially released January 14, 2022*

*Procedural History*

Substitute information charging the defendant with violation of probation, brought to the Superior Court in the judicial district of New Britain, geographical area number fifteen, and tried to the court, *C. Taylor, J.*;

judgment revoking the defendant's probation, from which the defendant appealed; thereafter, the court, *Keegan, J.*, dismissed in part and denied in part the defendant's motion to correct an illegal sentence, and the defendant filed an amended appeal. *Reversed; judgment directed.*

*Jon L. Schoenhorn*, for the appellant (defendant).

*Brett R. Aiello*, deputy assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, *Elizabeth M. Moseley*, senior assistant state's attorney, and *Alexander Beck*, assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. The primary issue in this appeal is whether the state presented sufficient evidence at a violation of probation hearing to establish that an airsoft pellet gun is a firearm within the meaning of the criminal possession of a firearm statute, General Statutes § 53a-217.[1] The defendant, Ramon Lopez, claims that the airsoft pellet gun seized from his residence is not a "firearm," as defined by General Statutes § 53a-3 (19),[2] because it is not a "weapon . . . from which a shot may be discharged" but, rather, a recreational toy that dispenses plastic pellets. The state responds that an airsoft pellet gun is a firearm pursuant to *State* v. *Grant*, 294 Conn. 151, 161, 982 A.2d 169 (2009), which held that a BB gun is a firearm for purposes of § 53a-3 (19). We conclude that the evidence in the present case was insufficient to establish that the airsoft pellet gun found in the defendant's residence is a firearm, as defined by § 53a-3 (19), and, therefore, we reverse the judgment of the trial court.

The trial court found the following facts, which we supplement as needed with undisputed facts in the record. On November 7, 2003, the defendant was convicted of two counts of risk of injury to a child in violation of General Statutes (Rev. to 2003) § 53-21 (a) (1), a class C felony, and sentenced to two concurrent terms of eight years of incarceration, execution suspended, and five years of probation. The defendant's sentence was imposed consecutively to a seventeen year sentence he already was serving in a separate case for two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5). The defendant was ordered to comply with the following relevant standard conditions of probation: (1) "Do not violate any criminal law of the United States, this state or any other state or territory." And (2) "If you are on probation for a felony conviction . . . you must not possess, receive or transport any firearm or dangerous instrument as those terms are defined in [§] 53a-3 . . . ." As a special condition of the defendant's probation, the trial court also ordered that he must "[o]bey all laws of this state, any other state and all federal laws."

On October 27, 2017, the defendant was released from the custody of the Department of Correction and began serving his five year term of probation. Upon release, the defendant was informed of, and indicated that he understood, the conditions of his probation, including the standard condition prohibiting him, "as a convicted felon, from possessing, receiving, or transporting any firearm, as defined by . . . § 53a-3." Additionally, the defendant signed a firearm acknowledgment form, which provided: "I, [Ramon Lopez], acknowledge and understand that I am currently under a period of probation supervision, and in accordance with a specific [c]ourt order and/or . . . General Statutes [§§] 29-33,

29-36f, 29-36k, 53a-30, 53a-217, and/or 53a-217c, **I am ineligible to possess a firearm as a condition of my probation**." (Emphasis in original.)

On March 13, 2019, the Bristol Police Department received a report that the defendant was in possession of a gun at his place of employment. As part of their investigation, officers obtained a search warrant for the defendant's residence, where they seized the following items: (1) one black KWC airsoft pellet gun; (2) one silver Bearcat River .177 caliber BB gun; (3) a small plastic cup containing BBs; and (4) a letter addressed to the defendant at his residence. Thereafter, the defendant was arrested and charged with criminal possession of a firearm in violation of § 53a-217.[3]

In light of the defendant's arrest for alleged criminal conduct committed while on probation, the defendant was charged in the present case with a violation of the conditions of his probation under General Statutes § 53a-32, "in that he engaged in conduct constituting criminal possession of a firearm . . . ."[4] The defendant moved to dismiss the violation of probation charge, and the trial court heard oral argument on the defendant's motion at a violation of probation hearing. During oral argument, defense counsel claimed that the guns seized from the defendant's residence do not fall "under the definition of a firearm" because they shoot plastic pellets. The state opposed the defendant's motion, arguing that, pursuant to *State* v. *Grant*, supra, 294 Conn. 161, a BB gun is a firearm under § 53a-3 (19). The trial court denied the defendant's motion on the basis of the authority established in *Grant*.

At the evidentiary hearing on the violation of probation charge, the state adduced evidence that the defendant was on probation, the conditions of which included refraining from breaking the law or possessing firearms, when the airsoft pellet gun and the BB gun were seized from his residence. Scott Werner, a detective employed by the Bristol Police Department, testified as to the operability of the seized items. Werner explained that the airsoft pellet gun uses "air to push a [ball shaped] plastic projectile out of a barrel . . . ." Specifically, "the slide racks back and forth," creating "a small pressurized chamber that releases and pushes the projectile out." Werner tested the airsoft pellet gun and determined that it functioned as intended by the manufacturer because it discharged an airsoft pellet from the muzzle. Although Werner was unable to verify the velocity with which the plastic pellet was propelled, he testified that "it did leave with a velocity. It did not simply fall out [of] the barrel."

With respect to the BB gun, Werner explained that it "did not have all the pieces necessary" to fire a projectile, so he had to "contact the manufacturer, [which] then sent [him] the pieces . . . needed in order to make th[e] firearm fire." Specifically, the BB gun was

missing a carbon dioxide canister and a cartridge to hold the BBs, both of which are proprietary in nature and necessary "to actually function th[e] gun."

On cross-examination, Werner explained that airsoft pellet guns differ from BB guns because they use a different type of ammunition. A BB gun, such as the one seized from the defendant's residence, can fire both plastic pellets and metal BBs, whereas an airsoft pellet gun can fire only airsoft pellets, which are "plastic round ball[s]." After redirect examination, the trial court asked Werner if he knew whether the airsoft pellet gun or the BB gun was capable of discharging "a projectile . . . with enough velocity . . . [to] be able to put a person's eye out . . . ." Werner responded: "I think that's a hard determination for me to make, to say put somebody's eye out. I can't say that, to be honest." Neither the state nor the defendant followed up on this line of questioning.

At the close of the state's evidence, defense counsel moved for a judgment of acquittal or a finding of no violation of probation, arguing that the state had failed to establish that the airsoft pellet gun or the BB gun seized from the defendant's residence was a firearm, as defined by § 53a-3 (19). Counsel contended that the BB gun "was not operable [and], therefore, not a firearm," and, with respect to the airsoft pellet gun, "that a pellet gun is not a firearm." Alternatively, counsel argued that the evidence was insufficient to establish that the defendant was in possession of the items seized because he resided in a multifamily dwelling, and "the doctrine of nonexclusive possession would cast serious doubt as to whether . . . any firearm that was found in the house at that time exclusively was in the actual or constructive possession of [the defendant]." The state opposed the motion, claiming that it had met its burden of establishing, by a preponderance of the evidence, that the defendant was in criminal possession of a firearm pursuant to *State* v. *Grant*, supra, 294 Conn. 161. The trial court denied the defendant's motion.

At the conclusion of the evidence on the violation of probation charge, the trial court found "that the preponderance of the evidence in this matter show[ed] that the defendant did possess the seized items within his residence" and that the airsoft pellet gun "was, in fact, a firearm pursuant to § 53a-3 [19] and was capable of discharging a shot, specifically, six millimeter pellets." The trial court arrived at a different conclusion with respect to the BB gun, which the court found was not a firearm because it "was not capable of firing a shot, as required by statute, due to the fact that the weapon did not have the necessary cartridge . . . capable of holding a BB . . . ." Accordingly, the trial court determined that the defendant had engaged "in felonious conduct, criminal conduct while he was on probation by possessing a firearm [that] was capable of discharging

a shot." The court concluded that the defendant consequently had violated the standard conditions of his probation requiring him to refrain from violating the law or possessing a firearm, as defined by § 53a-3 (19), as well as the special condition that required him to obey all the laws of this state. The trial court's conclusion that the defendant had violated the special and standard conditions of his probation rested entirely on its finding that the defendant engaged in conduct constituting criminal possession of a firearm.

After finding that the defendant was not amenable to supervised probation, the trial court revoked the defendant's probation and sentenced him to 8 years of incarceration, execution suspended after 56 months, and 1273 days of probation. In addition to the preexisting conditions of probation, the trial court imposed the additional condition that the defendant is "not to possess any pellet guns, BB guns, zip guns, cap guns, or anything of that nature, or any firearm replicas, [or] anything that looks like a pistol, handgun, rifle, shotgun, assault weapon or the like." The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.[5]

On appeal, the defendant raises four claims: (1) the trial court's factual finding that the defendant possessed a firearm in violation of § 53a-217 was clearly erroneous because the evidence was insufficient to establish that (a) the airsoft pellet gun seized from his residence was a "weapon . . . from which a shot may be discharged," as defined by § 53a-3 (19), and (b) he was in constructive possession of the airsoft pellet gun; (2) the defendant's probation was revoked on the basis of uncharged criminal conduct in violation of the due process clause of the fourteenth amendment because he was charged with possessing a firearm at his workplace but found guilty of possessing one at his residence; (3) § 53a-217 is unconstitutionally vague "because no reasonable person [would think] that a toy pellet gun that discharges six millimeter plastic pellets is, in fact, a 'firearm' "; and (4) the trial court abused its discretion in imposing an unduly harsh sentence because the defendant's conduct "fell far outside the 'heartland' of the offense of criminal possession of a firearm and was de minimis . . . ." For the reasons that follow, we agree with the defendant's claim that the evidence was insufficient to support the trial court's factual finding that the airsoft pellet gun seized from his residence was a "firearm," as defined by § 53a-3 (19), and we reverse the trial court's judgment on that ground.

The principles governing a trial court's factual finding regarding a violation of probation are well settled. "[A]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial

discretion that the probationer has not met the terms of his probation. . . . It is also well settled that a trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . Accordingly, [a] challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to support [the court's finding of fact] . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Maurice M.*, 303 Conn. 18, 26–27, 31 A.3d 1063 (2011).

To determine whether the evidence was sufficient to establish that the defendant violated the conditions of his probation by possessing a firearm, we must examine the statutory definition of the term "firearm" in § 53a-3 (19). Statutory construction is a question of law over which we exercise plenary review. See, e.g., *State* v. *Grant*, supra, 294 Conn. 157; see also General Statutes § 1-2z.

Section 53a-3 (19) provides that " '[f]irearm' means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other *weapon, whether loaded or unloaded from which a shot may be discharged . . . .*" (Emphasis added.) Similarly, § 53a-3 (6) provides in relevant part that a "deadly weapon" is "any *weapon, whether loaded or unloaded, from which a shot may be discharged,* or a switchblade knife, gravity knife, billy, blackjack, bludgeon or metal knuckles. . . ." (Emphasis added.)

We have previously construed the meaning of the phrase "weapon . . . from which a shot may be discharged" in § 53a-3 and are guided by that precedent. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93–94, 70 A.3d 1 (2013) (observing that, when construing statutes, "we . . . are bound by our previous judicial interpretations of the language and the purpose of the statute"). In *State* v. *Hardy*, 278 Conn. 113, 896 A.2d 755 (2006), we addressed whether a "weapon . . . from which a shot may be discharged," as used in subdivision (6) of § 53a-3, requires "that a shot be discharged by gunpow-

der . . . ." (Internal quotation marks omitted.) Id., 115. In that case, the defendant, Raymond Hardy, was convicted of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), an essential element of which is that the perpetrator or another participant in the robbery be "armed with a deadly weapon . . . ." Id., 119. "Evidence presented at trial established that the air pistol found in [Hardy's] apartment used carbon dioxide cylinders as a propellant and was designed to shoot .177 caliber pellets. . . . The state also submitted as a full exhibit the pistol's operating manual, which stated that the pistol was 'NOT A TOY. . . . MISUSE OR CARELESS USE MAY CAUSE SERIOUS INJURY OR DEATH. MAY BE DANGEROUS UP TO 400 YARDS . . . .' " (Emphasis in original.) Id., 117–18. The operating manual further specified "that the gun has an '8 Shot Revolver' mechanism that shoots .177 caliber 'Lead Airgun Pellet' ammunition. The gun is designed to shoot its ammunition at a muzzle velocity of at least 430 feet per second." Id., 118 n.4.

On appeal, Hardy challenged his conviction on the ground that the air gun used during the robbery was not a deadly weapon, as defined by § 53a-3 (6), because it was not a weapon from which a shot may be discharged. Id., 119. Hardy did "not claim that the air gun was not a weapon or that it did not fire shots. Instead, he claim[ed] that the 'discharge' of the weapon, as used in § 53a-3 (6), must take place through the use of gunpowder." Id., 120. We rejected Hardy's claim for two reasons. First, we observed that the plain language of the statute "does not require that the shot be discharged by gunpowder." Id. Second, we relied on out-of-state case law concluding that "an air or pellet gun is both designed for violence and capable of causing death or serious bodily injury." Id., 122. We "recognize[d] that § 53a-3 (6) does not expressly define deadly weapons as instruments that are *designed* or *intended* to cause death or serious bodily injury, as the statutes in many other states do," but pointed out that "§ 53a-3 (6) was intended to encompass 'items *designed for violence.*' " (Emphasis in original.) Id., 126. "We therefore conclude[d] that, if a weapon from which a shot may be discharged is designed for violence and is capable of inflicting death or serious bodily harm, it is a deadly weapon within the meaning of § 53a-3 (6), regardless of whether the shot is discharged by gunpowder." (Footnote omitted.) Id., 127–28. In arriving at this conclusion, "[w]e recognize[d] that not all items capable of discharging a shot are weapons or designed for violence" and "that many guns that are capable of causing death or serious bodily injury were not designed for violence against persons. Nevertheless, such guns are designed for violence in the sense that they are intended to cause damage or injury to their intended target." Id., 127 n.12. Because the evidence adduced at trial was sufficient to establish "that the air pistol used by [Hardy] was

designed for violence and was capable of causing death or serious bodily injury"; id., 128; we upheld Hardy's conviction. Id., 133.

Three years later, in *State* v. *Grant*, supra, 294 Conn. 151, we considered whether a BB gun was a " 'weapon, whether loaded or unloaded, from which a shot may be discharged' " for the purpose of the definition of a "firearm" in § 53a-3 (19). Id., 158. The sentence of the defendant, Lawrence Grant, was enhanced under General Statutes § 53-202k for using, or being armed with and threatening the use of, a firearm in the commission of a felony on the basis of his use of a BB gun during an attempted robbery. Id., 152–53. At trial, the state produced evidence that the BB gun was "an operable Marksman Repeater spring-loaded air gun designed to shoot .177 caliber steel BBs" and "capable of discharging a shot that could cause serious bodily injury." Id., 156.

On appeal, Grant did not dispute that the BB gun was a "weapon" that fired a "shot" but claimed that it was not a firearm because it did "not discharge a shot by gunpowder . . . ." Id., 154. In light of "our analysis and construction of § 53a-3 (6) in *Hardy*," we rejected Grant's claim, reasoning that the "language defining 'deadly weapon' for purposes of § 53a-3 (6) . . . is identical to the language of § 53a-3 (19), [and] the legislature readily could have restricted the term 'firearm' in § 53a-3 (19) to those guns that use gunpowder to discharge their shots" but did not. Id., 160. Furthermore, the definitional language in § 53a-3 (6) and (19) is identical, and, "ordinarily, the same or similar language in the same statutory scheme will be given the same meaning." Id. We therefore held "that a BB gun does not fall outside the definitional purview of § 53a-3 (19) merely because it operates without gunpowder" and that Grant could not "prevail on his claim that the evidence adduced by the state was insufficient to establish that the BB gun . . . was a firearm for purposes of § 53a-3 (19) . . . ." Id., 161.

Although our case law establishes that an operable BB gun is a "weapon . . . from which a shot may be discharged" under § 53a-3 (6) and (19), it does not stand for the broad proposition that "*all* pellet guns are firearms as a matter of law." (Emphasis in original.) *State* v. *Hart*, 118 Conn. App. 763, 774, 986 A.2d 1058, cert. denied, 295 Conn. 908, 989 A.2d 604 (2010). Indeed, in *Hardy*, we explicitly recognized that "not all items capable of discharging a shot are weapons or designed for violence." *State* v. *Hardy*, supra, 278 Conn. 127 n.12, citing *State* v. *Coauette*, 601 N.W.2d 443, 446–47 (Minn. App. 1999), review denied, Minnesota Supreme Court, Docket No. C4-98-2286 (Minn. December 14, 1999); see *State v. Coauette*, supra, 447 (paintball gun is not dangerous weapon). To prove that an item capable of discharging a shot is a "weapon" under § 53a-3 (6), the

state must produce evidence to establish that it is "designed for violence" and "capable of inflicting death or serious bodily harm . . . ."[6] *State* v. *Hardy*, supra, 127–28; see id., 132 ("both deadly weapons and firearms are designed for violence and are capable of inflicting death or serious bodily injury"); Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) p. 1338 (defining "weapon" as "something (as a club, knife, or gun) used to injure, defeat, or destroy" or "a means of contending against another"); Webster's Third New International Dictionary (1961) p. 2589 (defining "weapon" as "an instrument of offensive or defensive combat: something to fight with: something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy").

In the present case, there is no evidence in the record establishing either prong of this definition. There is no evidence of the purpose for which the airsoft pellet gun was designed. For example, the state did not introduce into evidence the operating manual, statements of purpose from the manufacturer's website, or expert testimony describing the use for which the airsoft pellet gun was intended.[7] Compare *State* v. *Hardy*, supra, 278 Conn. 118–19 (BB gun was deadly weapon in light of evidence that it was not toy and could cause serious injury or death), with *State* v. *Coauette*, supra, 601 N.W.2d 446–47 (paintball gun was not firearm because it was "designed for use in a game and . . . its projectiles are [liquid paint] capsules designed to burst on impact, rather than to pierce"). In the absence of such evidence, it is pure speculation whether the airsoft pellet gun is a toy designed for recreational use, as the defendant contends, or a weapon designed for violence and, therefore, a "firearm" under § 53a-3 (19). See, e.g., *State* v. *Bemer*, 340 Conn.    ,    ,    A.3d    (2021) (without evidence, fact finder "would have to resort to impermissible speculation").

Additionally, the state failed to present any evidence from which it reasonably could be inferred that the airsoft pellet gun in this case was capable of inflicting death or serious bodily harm. Although Werner testified that the airsoft pellet gun could discharge a six millimeter plastic pellet with velocity, there was no evidence as to the nature or degree of that velocity, or whether it was sufficient to cause physical injury, much less serious bodily harm. Cf. *State* v. *Grant*, supra, 294 Conn. 156 (state introduced evidence that BB gun "was capable of discharging a shot that could cause serious bodily injury"); *State* v. *Hardy*, supra, 278 Conn. 118 (state introduced evidence that BB gun " 'may cause serious injury or death' " (emphasis omitted)); *State* v. *Guzman*, 110 Conn. App. 263, 275–76, 955 A.2d 72 (2008) (state introduced evidence that " 'misuse or careless use [of the BB gun] may cause serious injury or death' "), cert.denied, 290 Conn. 915, 965 A.2d 555 (2009). Indeed, in response to a direct question from the trial court on this precise

point, Werner was unable to say whether a projectile fired from the airsoft pellet gun could injure a person by, for example, "put[ting] [an] eye out." Given the lack of evidence, we are compelled to conclude on this record that the trial court's factual finding that the airsoft pellet gun was a "weapon" capable of firing a shot for the purpose of the definition of a "firearm" under § 53a-3 (19) was clearly erroneous.

The judgment is reversed and the case is remanded with direction to find no violation of probation and to render judgment accordingly.

In this opinion the other justices concurred.

* January 14, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-217 (a) (1) provides in relevant part that "[a] person is guilty of criminal possession of a firearm, ammunition or an electronic defense weapon when such person possesses a firearm, ammunition or an electronic defense weapon and . . . has been convicted of a felony committed prior to, on or after October 1, 2013 . . . ."

[2] General Statutes § 53a-3 (19) defines the term "firearm" as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ."

[3] In February, 2020, the defendant pleaded guilty to one count of breach of the peace in the second degree in violation of General Statutes § 53a-181 and was sentenced to six months of incarceration.

[4] The defendant was charged by long form information with one count of violating his probation, as follows: "Elizabeth Moseley, assistant state's attorney, accuses [the defendant] of violation of probation and charges that, on or about March 11, 2019, at around 12 [p.m.], in the area of 210 Redstone Hill Road in the city of Bristol . . . [the defendant] did violate the conditions of his probation, in that he engaged in conduct constituting criminal possession of a firearm and that this [led] to his arrest on March 14, 2019, in violation of . . . § 53a-32."

[5] After filing the present appeal, the defendant filed a motion to correct an illegal sentence pursuant to Practice Book § 43-22, claiming that the sentence imposed by the trial court was illegal because § 53a-217 is preempted by 15 U.S.C. § 5001, which defines airsoft pellet guns as "look-alike . . . firearm[s] . . . ." 15 U.S.C. § 5001 (c) (2018). The trial court dismissed the defendant's motion in part for lack of subject matter jurisdiction on the ground that the defendant's "argument [was] fully centered on the basis of the violation of probation [finding] and not the sentence." To the extent that defense counsel claimed during oral argument "that the defendant's sentence was disproportionate under the circumstances . . . and excessive in violation of the eighth amendment to the United States constitution," the trial court denied the defendant's motion because he had "failed to articulate and demonstrate that violation . . . ." The defendant thereafter amended the present appeal to include the dismissal in part and denial in part of his motion to correct an illegal sentence. In his briefs submitted to this court, however, the defendant does not challenge the disposition of his motion to correct an illegal sentence.

[6] Similarly, in *Nealy* v. *State*, Docket No. 01-18-00334-CR, 2019 WL 6869337 (Tex. App. December 17, 2019), the Court of Appeals of Texas held that "[a]n airsoft pistol is [neither] a 'firearm' nor . . . a 'deadly weapon' per se. . . . The [s]tate, however, may prove that an airsoft pistol is a deadly weapon by presenting evidence concerning its capabilities or use." (Citation omitted.) Id., *4. In *Nealy*, the state adduced evidence "that plastic pellets discharged from spring-loaded airsoft pistols like the 'black ops' [airsoft pellet gun possessed by the defendant] travel at 330 feet per second or [more than] 200 miles per hour, and . . . can cause serious bodily injury because the pellets they discharge can put someone's eye out." Id. Additionally, the "black ops airsoft pistol" contained a warning label "on its side [that read] 'warning—not a toy. Wear eye protection to prevent serious injury to eye.' " Id. On the basis of this evidence, the court held that the jury reasonably could have found that "the 'black ops' airsoft pistol was . . . capable of causing seriously bodily injury . . . ." Id.

The state cites *Nealy* in the present case in support of its claim that an

airsoft gun is a firearm, but the case illustrates why, on this record, the state cannot prevail. As explained in the text of this opinion, the state failed to adduce any evidence of the capability, use, or intended purpose of the airsoft pellet gun seized from the defendant's residence.

[7] Werner testified that the airsoft pellet gun "functioned as it is intended [by] the manufacturer" because it "discharge[d] an airsoft pellet from the muzzle," but he did not explain the intended purpose for which an airsoft pellet is discharged.

------------------------------------